UNION PLANTERS BANK, N.A., Successor Through Merger to Magna Bank, N.A., Plaintiff-Appellee, v. FT MORTGAGE COMPANIES, d/b/a Sunbelt National Mortgage, Defendant-Appellant (Charles E. LaFore *et al.*, Defendants).

Fifth District   No. 5—02—0450

Opinion filed July 17, 2003.

Joshua G. Vincent, of Hinshaw & Culbertson, of Chicago, for appellant.

Cherie K. MacDonald, of Stolar Partnership, of Belleville, for appellee.

JUSTICE KUEHN delivered the opinion of the court:

This case involves a determination of the priority of mortgage liens. FT Mortgage Companies appeals from the trial court's May 21, 2002, order resolving competing motions for a summary judgment on the matter of a lien priority in favor of Union Planters Bank, N.A. In reaching this decision, the trial court concluded that the doctrine of conventional subrogation did not apply to the facts at issue.

Charles and Theresa LaFore owned a home in Belleville, Illinois. In January 1994, they executed a note and mortgage in favor of Delmar Financial Company (Delmar) in the amount of $120,650. That mortgage was recorded on January 26, 1994.

In December 1996, the LaFores executed a second note and

mortgage on their Belleville home, in favor of Equicredit Corp. of America (Equicredit). This mortgage amount was $28,740. Equicredit recorded its mortgage on December 27, 1996.

In February 1998, the LaFores executed a third note and mortgage on their home, in favor of Magna Bank, N.A. This mortgage amount was $138,068. Magna Bank, N.A., recorded its mortgage on March 25, 1998. Magna Bank, N.A., later merged with Union Planters Bank, N.A. (UPB), and the loan became UPB's loan.

Eight months later, in November 1998, the LaFores applied for a loan from the defendant, FT Mortgage Companies (FT), in a "cash-out refinancing" deal in which the proceeds would be utilized to pay off prior mortgages and still provide the LaFores with some cash. This mortgage was in the amount of $148,000 and was recorded on April 26, 1999.

In applying for this final mortgage, the LaFores only acknowledged the initial two mortgages—Delmar and Equicredit, omitting the UPB mortgage. FT's underwriting of the mortgage was premised upon the payoff and release of the Delmar and Equicredit mortgages. Its closing instructions additionally required the confirmation of the first-lien position of the FT mortgage, in the form of a "First Lien Letter."

FT did not conduct its own title searches and hired a title company to do so. Reliable Research (Reliable) conducted its title search and located only two mortgages on this property, but not the same two mortgages listed by the LaFores. Reliable found the Equicredit and Magna Bank, N.A., mortgages. Reliable did not list the Delmar mortgage. FT's instructions to Reliable were to pay off all existing liens on the LaFores' property, stating, "NO SUBORDINATE LIENS TO REMAIN OPEN AT CLOSING." Interestingly, Reliable took the loan proceeds and paid off two mortgages, but not the two mortgages it had located in its title search. Reliable paid off the Delmar and Equicredit mortgages totaling $136,379, and it paid nothing to UPB, leaving an approximate $138,000 mortgage outstanding. The sum of $3,892 was disbursed to the LaFores, and the balance of the FT mortgage went for closing costs. The UPB mortgage remained in effect.

Apparently, Reliable's closer made the erroneous assumption that Magna Bank, N.A., had assigned its mortgage to Delmar. A quick look at the title search would have revealed the error in this assumption, as the Magna Bank, N.A., mortgage was clearly dated and recorded after the Delmar mortgage.

Apparently, the LaFores made no further payments to UPB on its mortgage, and after the passage of four months, UPB filed this foreclosure case on August 30, 1999. FT filed a counterclaim seeking a

declaration that the subsequently recorded FT mortgage should have priority over the earlier-filed UPB mortgage.

FT's mortgage contained the following clauses:

"Borrower shall promptly discharge any lien which has priority over this Security Instrument ***. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

\* \* \*

*** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property ***, then Lender may do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument ***.

Any amounts disbursed by Lender under this paragraph *** shall become additional debt of Borrower secured by this Security Instrument."

Each side filed a motion for a summary judgment. The trial court entered its order granting UPB's motion and denying FT's motion on May 21, 2002. FT appeals.

■ In determining the appropriateness of a summary judgment, the trial court strictly construes all evidence in the record against the movant and liberally in favor of the opponent. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986). The court must consider all pleadings, depositions, admissions, and affidavits on file to decide if there is any issue of material fact. *Myers v. Health Specialists, S.C.*, 225 Ill. App. 3d 68, 72, 587 N.E.2d 494, 497 (1992). On appeal, courts review summary judgment orders *de novo*. *Myers*, 225 Ill. App. 3d at 72, 587 N.E.2d at 497.

At issue is a somewhat rarely applied doctrine called conventional subrogation. FT contends that even though its mortgage was recorded on April 26, 1999, the trial court should have found that it was subrogated to the lien priorities of the two mortgages it paid off—Delmar's (filed on January 26, 1994) and Equicredit's (filed on December 27, 1996). If FT's lien was subrogated to the 1994 and 1996 dates, its lien would take priority over UPB's March 25, 1998, mortgage. Without the possibility of this subrogation theory, FT would clearly be out of luck, because its mortgage was not recorded until 13 months after UPB's mortgage was recorded.

■ The general rule with recorded liens, including mortgages, is

that "[a] lien that is [recorded] first in time *** has priority and is entitled to prior satisfaction of the property it binds." *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703, 734 N.E.2d 493, 496 (2000), citing *Cole Taylor Bank v. Cole Taylor Bank*, 224 Ill. App. 3d 696, 704, 586 N.E.2d 775, 780 (1992). However, "[t]he doctrine of first in time, first in right is not always as clear and obvious as it may seem" (*Aames Capital Corp.*, 315 Ill. App. 3d at 704, 734 N.E.2d at 497), and "blind adherence to the first in time, first in right doctrine is sometimes insufficient to determine lien priority" (*Aames Capital Corp.*, 315 Ill. App. 3d at 705, 734 N.E.2d at 497). The concept of subrogation is an exception to the "first in time, first in right" rule. Subrogation is a method by which one party involuntarily pays a debt of another and succeeds to the rights of the other with respect to the debt paid. *Aames Capital Corp.*, 315 Ill. App. 3d at 705, 734 N.E.2d at 497, citing *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319, 597 N.E.2d 622, 624 (1992). Subrogation applies in the context of lien priority in that one party is subrogated to the lien priority of another. *Aames Capital Corp.*, 315 Ill. App. 3d at 705, 734 N.E.2d at 497.

■ There are two types of subrogation—contractual or conventional rights and common law or equitable rights. *Aames Capital Corp.*, 315 Ill. App. 3d at 706, 734 N.E.2d at 498, citing *Schultz v. Gotlund*, 138 Ill. 2d 171, 173, 561 N.E.2d 652, 653 (1990). The application of the doctrine of equitable subrogation does not depend upon any set of circumstances but depends upon the equities of each individual case. *Aames Capital Corp.*, 315 Ill. App. 3d at 706, 734 N.E.2d at 498. Conventional subrogation occurs when there is an express agreement between the parties to the effect that the party paying the debts on behalf of the third party will be able to assert the rights of the original creditor. *Aames Capital Corp.*, 315 Ill. App. 3d at 706, 734 N.E.2d at 498. By paying the debt, the subrogee is entitled to the benefit of the security he satisfied with an expectation of receiving equal priority in terms of a lien. *Aames Capital Corp.*, 315 Ill. App. 3d at 706, 734 N.E.2d at 498, citing *Home Savings Bank v. Bierstadt*, 168 Ill. 618, 624, 48 N.E. 161, 162 (1897). In addition to the requirement of an express agreement, the lender seeking the benefits of a conventional subrogation must prove that the loan proceeds were used to refinance the mortgage for which the lender seeks to be subrogated, that no harm will come to an innocent party if priority is granted to the lender, and that there has been no gross negligence. *Home Savings Bank*, 168 Ill. at 624-25, 48 N.E. at 162. The precise language utilized by the Illinois Supreme Court in the *Home Savings Bank* case is as follows:

"It is the agreement that the security shall be kept alive for the

benefit of the person making the payment which gives the right of subrogation, because it takes away the character of a mere volunteer. *** [E]quity will effectuate the real intention of the parties, where no injury is done to an innocent party, by applying the principle of conventional subrogation. [Citations.]

This principle will be applied even where the record shows a release of the satisfied incumbrance, as the lien so satisfied will be removed for the benefit of the party satisfying the same, where there has not been gross negligence and where justice requires it should be done[;] and this will be done as against a subsequent incumbrancer whose incumbrance has not been taken or his position changed because of the record showing the discharge of the senior incumbrance. [Citations.]" *Home Savings Bank,* 168 Ill. at 624-25, 48 N.E. at 162.

The Illinois Supreme Court did not further expound upon its statement that gross negligence could not be tolerated in a conventional subrogation setting.

■ The application of conventional subrogation in the arena of mortgage refinancing was sanctioned in *Aames Capital Corp. v. Interstate Bank of Oak Forest. Aames Capital Corp.,* 315 Ill. App. 3d at 710, 734 N.E.2d at 501.

■ UPB contends that FT had no express agreement allowing it to assert the rights of the original creditors. UPB points to the generic form contract language utilized by FT in its legal documents. UPB presents no authority that generic contract language cannot form the basis of an express agreement. Two clauses contained within UPB's documents were identified and found to create an express agreement in *Aames Capital Corp. v. Interstate Bank of Oak Forest. Aames Capital Corp.,* 315 Ill. App. 3d at 708, 734 N.E.2d at 500. The *Aames Capital Corp. v. Interstate Bank of Oak Forest* language appears to be form language. We find that the form of the language at issue is not nearly as important as the intent of the parties to the contract.

Both the FT documents and the *Aames Capital Corp. v. Interstate Bank of Oak Forest* documents provided that no subordinate liens were to remain open at closing—to discharge any lien with priority over the mortgage—and that the refinancing mortgage holder could pay any sums secured by a lien that had priority over its mortgage and that any such sum paid would become additional debt secured by the mortgage. The location of these clauses within UPB's own documents is not relevant to the inquiry of the express agreement between the LaFores and FT.

The intent was clear—FT intended, by its actions, to receive equal priority in its lien and to be able to assert the rights of Delmar and Equicredit.

The loan proceeds were clearly used to refinance the mortgages for which the lender seeks to be subrogated. UPB argues that because the LaFores received some cash out of this refinancing deal, this element has not been met. UPB is correct that the borrowers in *Aames Capital Corp. v. Interstate Bank of Oak Forest* received nothing after refinancing their mortgages. *Aames Capital Corp.*, 315 Ill. App. 3d at 702, 734 N.E.2d at 495. However, we do not find this distinction to be critical. Refinancing a mortgage is somewhat of a guessing game. The borrower and the lender attempt to arrive at a figure that will pay off the note or notes, accrued interest, and oftentimes, costs of closing. This number is chosen before all facts are known with precise detail. Sometimes at closing, the borrower will receive cash back. Sometimes at closing, the borrower will owe additional funds. The amount at issue in this case, less than $4,000, is not so great that it appears somehow inequitable. In this case, the refinancing was a "cash-out" refinancing, with the intent that the borrowers would receive cash for the balance of the equity in their home. Regardless of whether some cash is handed to the borrowers at closing by way of purposeful means (the "cash-out" refinancing) or unintentional means, by overestimating the amount of funds necessary to pay off existing loans, interest, and closing costs, authority for the proposition that the borrower cannot receive a dime in a subrogation setting is lacking.

We also conclude that UPB could not have been harmed by FT's jump in priority to a position superior to that of UPB. At first glance, UPB's argument that it is harmed is obvious—if conventional subrogation applies, UPB is supplanted by FT and there is inadequate equity available to satisfy UPB's debt after FT's debt is satisfied. However, FT can only be subrogated to the amounts of the debts extinguished in its refinancing. *Aames Capital Corp.*, 315 Ill. App. 3d at 710, 734 N.E.2d at 501. In other words, the amount of money received by the LaFores, the interest, and the closing costs do not take lien priority over UPB. Furthermore, the previous mortgages were of record. Presumably, UPB had constructive knowledge of these unreleased mortgages when it loaned its money to the LaFores. Consequently, UPB would be in no worse a position than it was in prior to the refinancing.

We turn to the final issue—gross negligence. Arguably, negligence was committed in this case. FT did not directly commit negligence. However, its agent, Reliable, allegedly did. We must decide whether Reliable's alleged negligence is imputable to FT. We must also determine if this negligence is "gross" in nature. If so, then FT is not entitled to conventional subrogation.

Before we get to the issue of gross negligence, we must first

determine whether Reliable is truly FT's agent. An agency is essentially "a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2001). The party alleging an agency relationship bears the burden of proof by a preponderance of the evidence. *Amcore Bank, N.A.*, 326 Ill. App. 3d at 134, 759 N.E.2d at 181. The existence of an agency relationship turns on the facts, and therefore we cannot reverse the trial court's findings on these issues unless they are contrary to the manifest weight of the evidence. *Amcore Bank, N.A.*, 326 Ill. App. 3d at 135, 759 N.E.2d at 181. In determining whether an agency relationship exists, "[t]he right to control the manner of doing the work is the predominant factor." *Commerce Bank v. Youth Services of Mid-Illinois, Inc.*, 333 Ill. App. 3d 150, 153, 775 N.E.2d 297, 300 (2002).

Reliable's alleged negligently performed task was the title search. The facts contained within the record and the briefs and argument on appeal reflect no express or implied authority for FT to have exercised control over the manner in which Reliable performed and reported its title search. We find that Reliable was not FT's agent. FT cannot be bound by Reliable's allegedly negligent actions for purposes of determining whether FT is free from gross negligence. To the extent that the trial court determined that Reliable was FT's agent, we determine that such a finding is contrary to the manifest weight of the evidence. Because we conclude that any negligence on Reliable's part is not imputable to FT on agency theories, we do not address whether this negligence was "gross" in nature. Since FT is free from gross negligence, conventional subrogation is applicable to the facts of this case.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby reversed, and a judgment is entered on behalf of FT.

Reversed; judgment entered.

HOPKINS, P.J., and CHAPMAN, J., concur.