No. 2--06--0713     Filed: 6-29-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| UNIONBANK, | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04--CH--48 |
| | ) | |
| TRACY THRALL, a/k/a Tracy N. Thrall; | ) | |
| JAMIE THRALL, LAKE HOLIDAY | ) | |
| MARINA, INC., WILLIAM LOKEY, | ) | |
| JONELL LOKEY, DONALD KAUS, | ) | |
| CEARISE BENES, JAMES ROONEY, | ) | |
| EUREKA SAVINGS BANK, UNKNOWN | ) | |
| OWNERS, and NON-RECORD | ) | |
| CLAIMANTS, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Kurt P. Klein, |
| (Eureka Savings Bank, Defendant-Appellant). | ) | Judge, Presiding. |

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

This mortgage foreclosure case gave rise to a dispute between two banks, plaintiff UnionBank (Union) and defendant Eureka Savings Bank (Eureka), regarding which bank's loans had priority. The trial court held that Union had priority, and Eureka appeals. We reverse and remand.

The facts are largely undisputed. The mortgagor, Tracy Thrall, owned several parcels of residential real estate including one in Sandwich, Illinois, and one in Somonauk, Illinois. Thrall borrowed money from both Eureka and Union at various times and secured these loans with separate mortgages on the properties, as follows:

• On December 29, 1995, Thrall took out a mortgage with Eureka on the Sandwich property, in the amount of $100,800. Eureka recorded this mortgage on January 23, 1996. On May 31, 1996, Thrall took out a mortgage with Eureka on the Somonauk property in the amount of $112,800. Eureka recorded this mortgage on June 4, 1996. (These two mortgages are referred to herein as the 1996 mortgages.)

• On August 31, 1999, Thrall took out mortgages on both the Sandwich and Somonauk properties with Union, which recorded these mortgages on September 8, 1999 (the 1999 mortgages).

• On November 13, 2001, Thrall executed new promissory notes and mortgages on the two properties with Eureka, in the amount of $98,250 on the Sandwich property and $108,000 on the Somonauk property (the 2001 mortgages).

• On November 26, 2001, Eureka recorded the 2001 mortgages on the two properties and released the 1996 mortgages.

On May 6, 2004, Union filed an amended complaint for foreclosure on the Sandwich and Somonauk properties, alleging that its interests in the properties had priority over those of Eureka. Eureka filed a counterclaim alleging that Union's interests were subordinate to its own.

Union concedes that when it recorded the 1999 mortgages, it viewed those mortgages as junior to the 1996 mortgages held by Eureka. Indeed, the 1999 Union loan documents recite that the loan was secured by "junior mortgage[s]" on the Sandwich and Somonauk properties. Similar Union loan documents from what appear to be additional loans to Thrall in 2000 also recite that the security for the loans included "second mortgage[s]" on the two properties.

Where the parties differ is on the effect of Eureka's actions in 2001. Union contends that when Eureka released its 1996 mortgages, Union's loans became the senior mortgages on the properties. Eureka contends that its 2001 mortgages were merely replacements of the 1996 mortgages and thus were entitled to retain the priority of the 1996 mortgages.

Eureka filed a motion for summary judgment in which it contended that its liens were entitled to priority under the doctrine of "conventional subrogation." In support, it attached an affidavit from Chris Holdenrid, who averred that he was "a duly elected and active officer" of Eureka, that he had "personal knowledge of all the facts hereinafter set forth," and that the 2001 mortgages "were intended by Tracy Thrall and Eureka Savings Bank" as replacements for the 1996 mortgages. Eureka also cited Kankakee Federal Savings & Loan Ass'n v. Arnove, 318 Ill. App. 261 (1943), for the proposition:

> "[I]t is the settled law of this State that when a refunding mortgage is made, the lien of the old mortgage continues in effect without interruption and the new mortgage does not become subordinate to an intervening lien or interest attaching between the time of the recording of the old mortgage and the effective date of the new one, even though the old mortgage be released. This is because of the doctrine of conventional subrogation." Arnove, 318 Ill. App. at 268.

Eureka also asserted that Union's recording of its interests failed to comply with all statutory requirements.

In response, Union filed a motion to strike the Holdenrid affidavit as violating Supreme Court Rule 191 (210 Ill. 2d R. 191) because it was conclusory and insufficiently detailed. Union also filed

a response brief, arguing that the doctrine of conventional subrogation was inapplicable to this case because it has been defined by Illinois courts as involving three parties: the debtor, an original creditor-lienor, and a new creditor who pays the debt to the original creditor pursuant to an agreement with the debtor that he will assume lien rights equal to that of the original creditor, including priority over intervening lienors. See Western United Dairy Co. v. Continental Mortgage Co., 28 Ill. App. 2d 132, 135 (1960). Union argued that the doctrine of conventional subrogation could not apply here, where Eureka replaced its own debt. Union also pointed out that none of Eureka's 2001 documents indicate anywhere that the 2001 mortgages were intended as replacements for the 1996 mortgages. Union asserted that, instead, the doctrine of "first in time, first in right" should be applied, and that Eureka's 2001 mortgages must be subordinated to Union's 1999 mortgages because the Union mortgages were recorded earlier.

Union also cited Union Planters Bank, N.A. v. FT Mortgage Cos., 341 Ill. App. 3d 921, 925-26 (2003), as holding that a party seeking to apply conventional subrogation must show that it is free from gross negligence. Union argued that Eureka could not show this, as the release deeds it executed in 2001 unambiguously released all of its rights and interests in the earlier mortgages, and Eureka did not contact Union to obtain a subordination agreement. Union submitted the affidavit of Kenneth Jones, one of its officers, stating that although Eureka had requested that Union subordinate its 1999 mortgage on another property also owned by Thrall to a 2001 Eureka mortgage on that property, Eureka never made a similar request regarding the Sandwich and Somonauk properties. Finally, Union contended that its recording of the 1999 mortgages adequately met all statutory requirements.

In its reply to Union's arguments, Eureka admitted that perhaps "conventional subrogation" was not the best label for the legal principle it was espousing, but argued that this principle had been recognized by Illinois courts as far back as Shaver v. Williams, 87 Ill. 469 (1877), and had been referred to as "conventional subrogation" in modern cases including Arnove. Eureka also responded to Union's argument regarding gross negligence, arguing that it did not apply.

The trial court denied the motion to strike the Holdenrid affidavit, finding that the affidavit met the requirements of Rule 191 (210 Ill. 2d R. 191). The trial court also denied Eureka's motion for summary judgment, finding that the 2001 documents' silence on the issue of the parties' intent to replace the earlier mortgages stood in contrast to the Holdenrid affidavit's assertion that the parties did agree to this, and therefore there was a factual question preventing summary judgment. In ruling, the trial court suggested that additional evidence from the parties to the 2001 mortgages would likely be necessary to resolve the case.

Neither party produced any additional evidence on the issue of Eureka's intent in executing the 2001 mortgages and loan documents. Instead, Union filed a motion to adjudicate priority of liens, in which it asked the trial court to resolve the legal issue of which bank's liens had priority as a matter of law, contending that there were no disputed questions of fact. In their briefs on this motion, the parties raised essentially the same arguments that had been raised in the proceedings on summary judgment. Eureka once again submitted the Holdenrid affidavit in support of its position. Union did not renew its challenge to the affidavit, but argued that even if the affidavit were accepted as true, the doctrine of conventional subrogation did not apply and Union should win under the rule of first in time, first in right. The only new argument was the claim by Union that Eureka was "guilty of

laches," for the same reasons that Union previously claimed that Eureka was grossly negligent. Eureka responded that Union could not show the elements necessary for laches.

The trial court held a hearing on the motion to adjudicate priority of liens, at the close of which it took the matter under advisement. On July 21, 2005, it issued a letter ruling in which it found that: (1) Union's 1999 mortgages provided sufficient notice to meet statutory requirements; (2) the doctrine of conventional subrogation did not apply in this case; and (3) the principle of first in time, first in right governed the case. The trial court stated that to apply any other legal principle would "defeat the purpose of recording mortgage instruments." The trial court concluded that therefore Union's 1999 liens had priority over Eureka's 2001 liens. On August 17, 2005, the trial court entered an order to this effect. Eureka filed a timely notice of appeal.

The parties raise the same arguments on appeal as were raised in the motion to adjudicate priority of liens, with minor variations. Eureka has abandoned its claim that Union's recordation of the 1999 mortgages was deficient. Union has renewed its attack on the Holdenrid affidavit. We first consider the trial court's decisions regarding the legal issues applicable to the case, which we review de novo. Illinois Health Maintenance Organization Guaranty Ass'n v. Department of Insurance, 372 Ill. App. 3d 24, 31 (2007).

We conclude that the trial court erred in holding that "first in time, first in right" is the only legal principle properly applicable to this case. In Aames Capital Corp. v. Interstate Bank of Oak Forest, 315 Ill. App. 3d 700 (2000), this court noted:

"The doctrine of first in time, first in right is not always as clear and obvious as it may seem. For instance, a separate body of law governs lien priority in cases involving renewal

notes and mortgages. A renewal note and mortgage do not ordinarily operate as payment and in discharge of an original note for purposes of determining whether the renewal note maintained priority position." Aames, 315 Ill. App. 3d at 704, citing State Bank of Lake Zurich v. Winnetka Bank, 245 Ill. App. 3d 984, 991 (1993).

Indeed, the legal doctrine Eureka invoked has existed in Illinois case law for over 100 years, and it is not limited to the third-party situation described by Union. In Shaver, the supreme court held that a lender's refinancing of a debt secured by a mortgage, coupled with a simultaneous release of the original mortgage held by the lender, did not disturb the previous priority of liens on the land, where an intervening lienor took his lien with knowledge of the original mortgage. Shaver, 87 Ill. at 471. This was so because the intervening lienor, that is, the party who received a second mortgage on the property, was not prejudiced by the first lienor's retention of lien priority: the intervening lienor knew that his lien was junior in priority at the time he first issued the debt in exchange for the mortgage, and the priority of his lien was neither bettered nor worsened by the original lienor's issuance of a new mortgage in place of the old mortgage. As the supreme court stated:

"[N]o good reason can be shown why appellant [the intervening lienor] should have priority. When he made the loan and accepted a mortgage, the record disclosed the fact that appellee [the original lienor] had a prior lien. This record was constructive notice to him and all others of appellee's rights, and whatever interest he acquired in the premises was subordinate to that held by appellee. Appellant has in no manner been misled or deceived, and under such circumstances to give him priority of lien, from the fact alone that appellee canceled of record one mortgage *** and at the same time accepted another mortgage, deriving no substantial

advantage which he did not previously have, would be neither just nor equitable." Shaver, 87 Ill. at 472.

The supreme court reiterated this principle a few years later in Campbell v. Trotter, 100 Ill. 281 (1881). In Campbell, the original mortgagee refinanced the initial loan and took a new mortgage in order to give the borrower more time on the loan, but another lender took a mortgage on the property shortly before the new mortgage was recorded. The supreme court held that the original mortgagee was entitled to assert the priority of the first mortgage. Campbell, 100 Ill. at 285.

This doctrine is not really an exception to the rule of first in time, first in right. Instead it simply holds that, under certain circumstances, equity requires that a subsequent lienor be considered the same as if he were the original lienor. "The [original] mortgage, despite being released, is deemed to have continued uninterrupted *** and thus preceded [the intervening lienor's] purported lien in time. Therefore it is the [original] mortgage that was 'first in time' and [the party who refinanced that mortgage] *** that is 'first in right.' " La Salle Bank, N.I. v. First American Bank, 316 Ill. App. 3d 515, 523 (2000), citing Arnove, 318 Ill. App. at 268.

Neither Shaver nor Campbell refers to this doctrine as "conventional subrogation." That term was first used in Home Savings Bank v. Bierstadt, 168 Ill. 618, 624 (1897), where the court defined conventional subrogation as "an equitable right springing from an express agreement with the debtor, by which one advances money to pay a claim for the security of which there exists a lien, by which agreement he is to have an equal lien to that paid off." This definition of the term, in which a third party pays off the original debt and assumes the place of the original lienor, has been fairly widely

applied, in cases ranging from Kaminskas v. Cepauskis, 369 Ill. 566 (1938), to Union Planters, 341 Ill. App. 3d at 925, which was decided within the last five years.

Some Illinois courts, however, have suggested that the phrase "conventional subrogation" encompasses both (1) the Shaver situation in which the original lienor refinances the initial loan and takes a new mortgage in return, but does so intending to maintain his priority, and (2) the Bierstadt situation in which a third party pays off an indebtedness in exchange for a new mortgage that retains the priority of the original indebtedness. In Arnove, 318 Ill. App. at 268, the court applied the term to the first of these situations. There, in 1926 the bank's predecessor loaned the Arnoves $2,000, which was secured by a mortgage. Liens were subsequently placed against the property to secure intra-family debts connected with the distribution of the estate of Mrs. Arnove. In 1937, the bank issued a new loan in the amount of $2,500, which provided funds to pay the balance on the original mortgage, delinquent taxes and assessments, a mechanic's lien, and miscellaneous insurance and title fees. The initial mortgage was released at the closing on the new loan. There was evidence that the family lienholders were aware of both the original mortgage and the refinancing and agreed that the bank would retain first priority. The court held that the bank's new mortgage had priority over the family's liens, and in the passage we quoted earlier, it described the legal principle being applied as conventional subrogation. Arnove, 318 Ill. App. at 268. Although Arnove involved the same lienor refinancing an earlier loan and mortgage, it cited (among other cases) Kaminskas, in which it was a third party who had paid off the original mortgage and was seeking to assert the same priority as the original mortgagee. Arnove, 318 Ill. App. at 268-69. The court appeared to regard both of these situations as falling within the ambit of conventional subrogation.

Similarly, in the recent case of Aames, the court's description of conventional subrogation at one point appears to apply to a third party who replaces the original lienor (Aames, 315 Ill. App. 3d at 709, citing Bierstadt, 168 Ill. at 624), yet the court also quotes with approval Arnove, which holds that conventional subrogation need not involve a third party (Aames, 315 Ill. App. 3d at 709, citing Arnove, 318 Ill. App. at 264). Aames itself involved a third party's refinancing of two other banks' earlier mortgages. Nevertheless, when the court announced its holding it did so in language equally applicable to either type of situation: "a refinancing mortgagee that records its mortgage lien is entitled to be subrogated to the original lien, and its corresponding priority position, established by the original mortgagee, under the doctrine of conventional subrogation." Aames, 315 Ill. App. 3d at 710. This language indicates that the doctrine of conventional subrogation applies equally to the replacement of the first mortgage by the original mortgagee and by a new lender. See also Firstmark Standard Life Insurance Co. v. Superior Bank FSB, 271 Ill. App. 3d 435, 440 (1995) (citing both third-party lienor cases and Arnove in describing the scope of conventional subrogation).

In examining this confusion in the case law over the proper scope of conventional subrogation, we note that our supreme court has applied that term only to a third party's refinancing of an original mortgage. See Bierstadt, 168 Ill. at 624; Kaminskas, 369 Ill. at 569-70. Although the supreme court also clearly recognizes the right of the original mortgagee to retain its initial priority over intervening lienors when issuing a new mortgage in place of the first mortgage, it has not used the phrase "conventional subrogation" in its cases recognizing this right. See Shaver, 87 Ill. at 472; Campbell, 100 Ill. at 282-83. The authors of the Restatement (Third) of Property prefer the term "replacement of senior mortgages" rather than "conventional subrogation" to describe this latter

situation. Restatement (Third) of Property §7.6, Comment e (1997). Regardless of the label, however, it is clear that the doctrine remains valid under Illinois law and that Eureka properly raised it before the trial court. Union's argument that conventional subrogation must involve a third party thus is misplaced, and the trial court erred in finding that the doctrine invoked by Eureka did not apply here.

We now turn to the application of that doctrine to this case. Examination of the courts' holdings in Shaver and Arnove enables us to discern the elements that must exist in order to apply the doctrine recognized in those cases, in which the original lienor who refinances the mortgage retains the priority of his lien over that of an intervening lienor despite the release of the original mortgage. The refinancing lienor must have intended to retain the priority of his original mortgage; the new mortgage must have been used to pay off the first mortgage; the intervening lienor must have been on notice of the original mortgage's priority at the time he issued the indebtedness secured by his lien; and the first mortgage must not have been released prior to the intervening lien. See Shaver, 87 Ill. at 471-72; Arnove, 318 Ill. App. at 268. Union has not raised any argument with respect to the last three of these elements. Thus, the only remaining issue is whether Eureka intended to retain its priority in 2001 when it refinanced and released the 1996 mortgages.

After it denied Eureka's motion for summary judgment, the trial court indicated that it anticipated receiving further evidence on this issue of intent. The trial court did not receive any additional evidence and thus never made a finding of fact on this issue. Although the trial court ultimately found in favor of Union, it did so on the basis of a purely legal determination, that is, its mistaken belief that the legal doctrine argued by Eureka did not apply. Now that we are reversing

this legal determination, we remand so that the trial court may complete its factual determination on the question of Eureka's intent in taking the 2001 mortgages and releasing the 1996 mortgages. In doing so, we provide the following additional guidance to the trial court.

Union argued that the unequivocal nature of a release demonstrates that Eureka did not intend to preserve its priority when it released its 1996 mortgages. In support of this contention, Union cited West Suburban Bank v. Attorneys' Title Insurance Fund, Inc., 326 Ill. App. 3d 502, 509 (2001), in which we held that a creditor's release of its mortgage extinguished any lien it had on the property, and other cases in which we stated generally that the release of a mortgage extinguishes the lien. None of these cases, however, involved the refinancing of the mortgage and the issuance of a new mortgage intended to take the place of the old mortgage that is being released. Moreover, the case law discussed above makes it clear that the release of a prior mortgage does not extinguish priority rights when the release is part of a refinancing of the mortgage. See Shaver, 87 Ill. at 472 (release of old mortgage did not show intent to relinquish priority of refinanced mortgage); Arnove, 318 Ill. App. at 268 (same). Thus, the release of the 1996 mortgages by itself does not indicate that Eureka intended to abandon its previous priority.

In denying Eureka's motion for summary judgment, the trial court found significant Eureka's 2001 mortgage and release documents, which do not explicitly state that the 2001 mortgages were intended as replacements for the 1996 mortgages. Union argued that this silence in the 2001 documents means that the Shaver/Arnove doctrine does not apply. Union noted that in Shaver, the new mortgage specifically stated that it was made "to secure the identical indebtedness" mentioned in the first mortgage. Shaver, 87 Ill. at 470. But although the presence of explicit language in the

new mortgage may be useful in determining that the new mortgage was intended to replace the first mortgage, the absence of such language has no legal significance. The new mortgage in Campbell had no such language, but the supreme court had no difficulty in determining that it was a replacement mortgage, where it met the other criteria outlined above. Campbell, 100 Ill. at 284-85. Similarly, the new mortgages in Bierstadt, Arnove, and Aames were silent on the issue of whether they were intended as replacement mortgages, yet the courts in these cases found that they were. Bierstadt, 168 Ill. at 625; Arnove, 318 Ill. App. at 268; Aames, 315 Ill. App. 3d at 708-09. Indeed, in Aames we rejected the very argument raised by Union here, stating that "we do not believe that *** a specific provision in the mortgage document regarding the assumption of the first priority position is required by the holding in Bierstadt." Aames, 315 Ill. App. 3d at 708. Thus, the silence of the 2001 documents regarding priority does not provide evidence on the issue of Eureka's intent to preserve its previous priority.

The 2001 documents do provide evidence of intent in a somewhat different respect, however; the new mortgages were recorded at the same time as the release of the old mortgages. In the context of mortgage refinancing, courts have viewed this type of contemporaneous action as demonstrating that the new mortgages were intended as replacements for the old. See, e.g., Shaver, 87 Ill. at 471 (the "fact that the release of the old mortgage and [the] filing for record of the other [new] one was done at the same time" indicated the original mortgagee's intent to retain his priority); Campbell, 100 Ill. at 284 (original mortgagee's priority maintained where he released the old mortgage of record "[upon] receiving the new notes and mortgage"); Arnove, 318 Ill. App. at 265, 268 (the old mortgage was released at the time the new loan was closed; court found original

-13-

mortgagee intended to maintain its priority). In this case, Eureka's recording of the new mortgages and its release of the 1996 mortgages both occurred on November 26, 2001. The contemporaneous nature of these events provides some evidence that the later mortgages were intended as replacements for the earlier ones.

On appeal, Union has renewed its attack on the Holdenrid affidavit. As we are remanding, however, we leave all of the issues regarding the affidavit's admissibility to the trial court's sound discretion. Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc., 346 Ill. App. 3d 996, 1010 (2004).

Union raises two final arguments on appeal. First, Union complains that it has been disadvantaged because the 2001 mortgages have longer maturity dates than the 1996 mortgages. This argument is unsupported by Illinois law. Indeed, Union did not cite any authority for this argument, and thus we need not consider it further. Midfirst Bank v. Abney, 365 Ill. App. 3d 636, 650 (2006). Union also charges that Eureka is guilty of laches, but we cannot see that Eureka unreasonably delayed in asserting its claim: it recorded its new mortgages promptly in 2001, and it filed its counterclaim on the issue of priority promptly after it had been served in this case. It is difficult to see what else Eureka should have done to protect its interests and assert its claim. Union argues that Eureka could have asked Union to subordinate its 1999 mortgages on the Sandwich and Somonauk properties, as it did on a different property also owned by Thrall and mortgaged to Eureka and Union. Eureka's actions with respect to this third property are simply not relevant to the issue of the priority of the mortgages on the Sandwich and Somonauk properties, however, and the law

we have discussed herein does not require a request for subordination. Neither of these arguments has merit.

For the foregoing reasons, the judgment of the circuit court of De Kalb County is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

McLAREN and BYRNE, JJ., concur.