# Illinois Official Reports

## Appellate Court

***Wilmington Savings Fund Society, FSB v. Zarkhin*, 2019 IL App (2d) 180439**

| | |
|---|---|
| Appellate Court Caption | WILMINGTON SAVINGS FUND SOCIETY, FSB, d/b/a Christiana Trust, as Trustee for Normandy Mortgage Loan Trust, Series 2015-1, Plaintiff-Appellee, v. ANATOLY ZARKHIN; TAMARA ZARKHIN; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as Nominee for Countrywide Bank, N.A.; RAVENSWOOD BANK; UNKNOWN OWNERS AND NONRECORD CLAIMANTS; ALEKSANDR BEKKERMAN; and IGOR NEMOV, Defendants (Aleksandr Bekkerman and Igor Nemov, Defendants-Appellants). |
| District & No. | Second District<br>Docket No. 2-18-0439 |
| Filed | March 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, Nos. 09-CH-4085, 10-CH-52; the Hon. Margaret A. Marcouiller, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas M. Paris, of Chicago, for appellants.<br><br>Adam A. Price, of Codilis & Associates, P.C., of Burr Ridge, for appellee. |

Panel

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice McLaren concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, as trustee for Normandy Mortgage Loan Trust, Series 2015-1, filed an action to foreclose a mortgage on property owned by defendants Anatoly Zarkhin and Tamara Zarkhin. Plaintiff alleged in part that its mortgage, although recorded after the mortgage held by defendants Aleksandr Bekkerman and Igor Nemov (collectively, Bekkerman), had priority over Bekkerman's mortgage (the BN mortgage) because it was intended and used to pay off at least in part two mortgages that had been recorded before the BN mortgage. The trial court agreed with plaintiff and later entered a judgment of foreclosure, followed by a final judgment confirming the result of the sheriff's sale. Bekkerman appeals. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On September 14, 2012, plaintiff's predecessor, BankUnited, filed a third amended complaint to foreclose its mortgage. The complaint alleged as follows. BankUnited's mortgage was dated February 8, 2007, and recorded March 23, 2007. The principal was $1,053,000. Aside from the Zarkhins, the named defendants were Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Countrywide Bank, N.A. (Countrywide), based on a mortgage executed by Countrywide and the Zarkhins on February 8, 2007, and recorded on March 23, 2007, for $400,000; Ravenswood Bank, by virtue of a 2008 mortgage for $83,358.96; Bekkerman, by virtue of a mortgage executed on January 8, 2007, recorded on January 24, 2007, and rerecorded on August 12, 2010, to correct the legal description of the property; and unknown owners and nonrecord claimants.

¶ 4    BankUnited alleged that its mortgage was superior to the BN mortgage because its mortgage assumed the priority of two others: one by Harris, N.A. (Harris), recorded December 15, 2005, and the other by Homecomings Financial Network (Homecomings), recorded August 16, 2006. The reason was that the note that BankUnited's mortgage secured was used to pay off the two prior mortgages, per paragraph 4 of the BankUnited mortgage document, which as pertinent here read:

> "Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.
>
> Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agreed in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contracts the lien in good faith by, or defends against enforcement of the lien in legal proceedings in which, in Lender's opinion operate to

- 2 -

prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 30 days of the date on which notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4."

¶ 5    The third amended complaint continued as follows. When its loan to the Zarkhins closed on February 8, 2007, the unpaid balances of the Harris and Homecomings loans were paid in full per the agreement in paragraph 4. The amount paid to satisfy the Harris loan was $676,367.79, and the amount paid to satisfy the Homecomings loan was $622,513.04. Both of these lenders executed and recorded releases. For this reason, under the doctrine of conventional subrogation, BankUnited's lien had priority over the BN mortgage lien, even though the BN mortgage lien had been recorded earlier. Further, the BN mortgage document explicitly made the BN mortgage " 'subordinate to the [Homecomings mortgage].' " Finally, even aside from this theory, BankUnited's mortgage was superior because the BN mortgage had not been properly recorded until August 12, 2010, when the legal description of the property was corrected. BankUnited prayed for an order of foreclosure that would grant its lien priority over all others, including the BN mortgage. On June 21, 2013, the court changed the foreclosing mortgagee to plaintiff, BankUnited's assignee.

¶ 6    On July 8, 2013, Bekkerman answered the third amended complaint, denying that the BN mortgage was inferior to plaintiff's. Eventually, the court set the matter for a hearing, to be preceded by a documents conference. On September 11, 2014, the court held the conference. On September 15, 2014, it held the hearing. We summarize the pertinent documents, going in roughly chronological order to clarify the history of this case.

¶ 7    The Harris mortgage was recorded December 15, 2005, and secured a revolving line of credit not to exceed $672,000. The Homecomings (later MERS) mortgage was recorded August 16, 2006, and secured a note for $610,000. The BN mortgage was dated January 8, 2007, and recorded January 24, 2007. It was titled "JUNIOR MORTGAGE" and stated, "This mortgage is subordinate to the [Homecomings mortgage]." The principal of the loan was $150,000.

¶ 8    Two mortgage-settlement statements are dated February 8, 2007. The one for the Countrywide mortgage recited that the loan principal was $400,000; the "Gross Amount Due from Borrower" was $247,651.82, comprising "Settlement Charges to Borrower" of $748 and "Funds Needed on [Countrywide mortgage]" of $246,903.82.

¶ 9    The BankUnited settlement statement recited that the gross amount due from the borrower was $1,305,168.82, comprising (1) "Settlement Charges to Borrower"—$6288, (2) "PAYOFF FIRST MORTGAGE to HOMECOMINGS FINAN"—$622,513.04, and (3) "PAYOFF SECOND MORTGAGE to HARRIS N.A."—$676,367.78. The amount paid by or on behalf of the borrower was $1,305,168.82. This comprised (1) "Principal Amount of New Loan(s)"—$1,053,000, (2) "Procees [*sic*] from [Countrywide mortgage]"—$246,903.82, and (3) "Broker Credit"—$5265.

¶ 10   On March 7, 2007, Harris signed the release of its mortgage; on March 18, 2007, Harris recorded the release. On March 14, 2007, MERS signed the release of its mortgage; on March 29, 2007, it recorded the release.

¶ 11        On April 25, 2014, Anatoly Zarkhin testified in an evidence deposition. We summarize the pertinent testimony. The purpose of the BankUnited mortgage was "to refinance all [the Zarkhins'] previous debts on the property." Specifically, and consistent with the settlement statement, Anatoly had intended to use the BankUnited loan to pay off the debts to Harris and Homecomings/MERS. Anatoly agreed with plaintiff's lawyer that "the whole loan was used up to pay off these two prior mortgages." That was "what [he] intended." Shown the settlement statement for the Countrywide mortgage, Anatoly stated that the $246,903.82 described as "Funds needed on" was "to cover shortage to pay off [his] previous loans to cover shortage from the same closing which took place, additional money." He agreed with plaintiff's lawyer that this sum was "the additional money that was needed to pay off the loans described [in] *** the Bank United [*sic*] settlement statement." Of the $400,000 borrowed from Countrywide, $246,903.82 went toward paying off the Harris and Homecomings mortgages, as recorded in the BankUnited settlement statement.

¶ 12        Anatoly testified that, when he took out the $150,000 BN mortgage loan, he expected to repay it immediately from the Countrywide loan. He did not do so but spent the funds on his business instead. The loans that he took out on February 8, 2007, were intended, collectively, to refinance all previous debts on the property, including the BN mortgage loan.

¶ 13        The parties submitted trial memoranda on whether plaintiff's lien was superior to the BN mortgage lien. Bekkerman argued as follows. For conventional subrogation to apply to the refinancing of a senior mortgage, there must be an express agreement to the effect that the refinancing loan will be used to pay off the senior mortgage, the loan proceeds must have been used to refinance the mortgage, there must be no harm to an innocent party if subrogation is granted, and there must be no gross negligence. See *Home Savings Bank of Chicago v. Bierstadt*, 168 Ill. 618, 624-25 (1897); *Union Planters Bank, N.A. v. FT Mortgage Cos.*, 341 Ill. App. 3d 921, 925 (2003). Plaintiff's mortgage did not satisfy these requirements, in that the BankUnited loan was insufficient to satisfy the total due under the Harris and Homecomings loans and the intent of the parties to the BankUnited mortgage had been to pay off not only these two liens but also the BN mortgage lien, which required the infusion of the Countrywide loan. Bekkerman also argued without elaboration that applying subrogation to plaintiff's lien would be unfair and that plaintiff had been grossly negligent.

¶ 14        Plaintiff argued as follows. BankUnited had never agreed to pay off the BN mortgage note, and Anatoly had never intended that the BN mortgage note be used to pay off Homecomings' and Harris's notes. Bekkerman had never pleaded such a theory. That the BankUnited note did not pay off the entire combined balance of the two senior notes did not bar subrogation; the funds needed to do so came from the Countrywide note, and Countrywide made no claim in the case. No unfair advantage would accrue to plaintiff from granting subrogation, as Bekkerman had been fully aware that the BN mortgage would be junior to those of Homecomings and Harris. Rather, denying plaintiff priority would grant a windfall to the BN mortgage, placing it ahead of the two senior mortgages.

¶ 15        The trial court initially found for Bekkerman. Its memorandum order stated as follows. Plaintiff had the burden to prove that it was entitled to conventional subrogation. Although the normal rule is first in time, first in right, a mortgagee who pays a debt on behalf of a third party might be able to assert the original lienholder's priority position (see *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703-05 (2000)). Here, the BankUnited loan was insufficient to pay off the two liens to which plaintiff sought to have its lien

subrogated. The senior liens were released only because Countrywide made an additional payment. Also, to the extent that there was an express agreement between plaintiff and the Zarkhins, it involved the payment of the BN mortgage loan, which did not happen. Thus, Bekkerman would be an innocent party harmed by the application of subrogation. The court did not discuss gross negligence, as it was unnecessary to do so.

¶ 16 Plaintiff moved to reconsider, arguing as follows. First, plaintiff could not be denied subrogation merely because it did not pay off the total balance of both the Homecomings and Harris mortgages. Plaintiff had paid off $1,053,000 of the combined unpaid balance of $1,298,880.82, and the remainder was advanced by the Zarkhins from the Countrywide mortgage. Insofar as any case law required that the senior debt be paid in full, the reason was that " 'partial subrogation would have the effect of dividing the security between the original obligee and the subrogee, imposing unexpected burdens and potential complexities of division of the security and marshaling upon the original mortgagee.' " *United Community Bank v. Prairie State Bank & Trust*, 2012 IL App (4th) 110973, ¶ 65 (quoting Restatement (Third) of Prop.: Mortgages § 7.6 cmt. a (1997)). Here, however, there was no such danger: both Homecomings and Harris had released their entire liens and Countrywide was not seeking subrogation. Plaintiff argued that, because either the Harris loan or the Homecomings loan was more than covered by plaintiff's loan, the court had denied subrogation "to even one of the two senior mortgages because BankUnited *overpaid* to discharge one." (Emphasis in original.) In any event, the judgment unjustly enriched Bekkerman, whose lien was explicitly junior to Homecomings' lien.

¶ 17 Plaintiff's motion argued second that paragraph 4 did not obligate BankUnited to pay off the BN mortgage. Further, Bekkerman was not a party to the BankUnited mortgage or a third-party beneficiary and thus lacked standing to assert that either party had breached the agreement (if, *arguendo*, either one did). Next, the settlement statement for the BankUnited loan said clearly that the purpose was to pay off the Homecomings and Harris liens; the statement said nothing about the Zarkhins or BankUnited paying off the BN mortgage lien. The settlement statement for the Countrywide loan did say that *that* loan was intended in part to help pay off the BN mortgage. That did not happen, because Anatoly spent the available money on his business instead. But BankUnited and its successor had no control over Anatoly's decision where to spend the proceeds, and it would be inequitable to deny plaintiff subrogation only because Anatoly applied someone else's loan to himself instead of paying off the BN mortgage.

¶ 18 Plaintiff contended that the BankUnited documents were unambiguous and that no intent could be read into them to use any of the loan proceeds to pay off the BN mortgage.

¶ 19 Plaintiff's motion contended that all of the elements of conventional subrogation had been met. First, paragraph 4 was an express agreement that the BankUnited mortgage would be used to pay off the Homecomings and Harris liens, as it obligated the Zarkhins to discharge those liens promptly. The settlement statement explicitly identified the Homecomings and Harris mortgages as being paid off with money from the BankUnited loan. That had been done, although the Zarkhins had also used money from Countrywide to complete the payments. Both Homecomings and Harris had recorded releases of their interests. Further, no unfair prejudice would come to Bekkerman were subrogation applied. The BN mortgage had been recorded after the Homecomings and Harris mortgages, and Bekkerman had been aware that the BN mortgage would be second in time to either of them. Moreover, the BN mortgage was

explicitly made subordinate to the Homecomings mortgage. Finally, plaintiff argued that Bekkerman had neither alleged nor proved that plaintiff had been grossly negligent. BankUnited had had no duty to Bekkerman respecting its title search and no obligation to pay off the BN mortgage. If the Zarkhins had had such a duty, their breach could not be used as a defense to subrogation.

¶ 20 In response, Bekkerman argued that the BankUnited mortgage had required the payment of the BN mortgage and that Anatoly had testified to his intent at the time to pay off the BN mortgage. Anatoly's failure to do so did not enlarge plaintiff's rights.

¶ 21 The court granted plaintiff's motion and entered a memorandum opinion explaining its holding as follows. Although the BankUnited loan had been insufficient to pay off both the Homecomings and Harris mortgages, that was no reason to deny plaintiff subrogation "up to the total amount of funding *actually provided* by BankUnited at the loan closing." (Emphasis in original.) Further, based on a reexamination of the settlement statements for the BankUnited and Countrywide loans, there was no express agreement between BankUnited and the Zarkhins to pay off the BN mortgage loan; instead, it appeared that the money for that purpose was to come from the Countrywide loan. Thus, Bekkerman would not be unfairly harmed by allowing plaintiff subrogation, being in no worse position than had BankUnited not provided any funds. Finally, BankUnited had not been negligent, much less grossly negligent.

¶ 22 Bekkerman moved to reconsider the order. The trial court denied the motion. On January 22, 2016, the court entered a judgment of foreclosure and sale, holding in part that plaintiff was due a total of $1,656,602.38 in principal, interest, costs, and attorney fees and that Bekkerman had a valid and subsisting lien for $560,369.05. The judgment was duly followed by an order confirming the sheriff's sale and entitling plaintiff to a deed to the property. Bekkerman timely appealed.

¶ 23                                          II. ANALYSIS

¶ 24 On appeal, Bekkerman argues that the trial court erred in holding that plaintiff's lien was subrogated to those of Harris and Homecomings and therefore superior to the BN mortgage lien. Bekkerman contends that plaintiff did not satisfy all the elements of conventional subrogation.

¶ 25 Plaintiff asserts that we must affirm because the record is insufficient to support Bekkerman's claim of error. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Plaintiff notes that the trial court's judgment noted that on September 15, 2014, the court held a "trial" on the subrogation issue, but no transcript or substitute appears in the record. Thus, plaintiff concludes, because we cannot say what evidence was presented at trial, or what facts the court found, we cannot decide whether the decision was supported by the evidence. We disagree.

¶ 26 Based on our reading of the entire record, including the court's discussion of the issues, it is apparent that the "trial" was based not on live testimony but only on the documents that were submitted at the conference. All of these documents are in the record. Therefore, the record is complete for our purposes. Also, as the facts are undisputed and the order at issue is tantamount to a summary judgment, our review is *de novo*. See *Aames*, 315 Ill. App. 3d at 703.

¶ 27 We note first, though, that Bekkerman's brief does not conform to Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018), which requires that the statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument

or comment, and with appropriate reference to the pages of the record on appeal." The statement of facts in Bekkerman's brief is argumentative in places. More important, it neither contains all of the facts needed for an understanding of the issues on appeal nor cites to appropriate pages of the record. The statement completely omits the BankUnited mortgage, except by referring without detail to a copy appended to the brief. It also fails to detail the order granting Bekkerman a judgment on the subrogation issue or the order granting plaintiff's motion to reconsider. In short, the *pro forma* statement of facts does not do what the rule requires. This deficiency is not so severe as to warrant a summary affirmance, but we admonish Bekkerman's counsel that compliance with the supreme court rules for briefing is mandatory and expected.

¶ 28    We now turn to the merits.

¶ 29    We briefly review the pertinent law. Normally, a lien that is first in time has priority and is entitled to prior satisfaction from the property it binds. *Aames*, 315 Ill. App. 3d at 703. However, by subrogation, one who pays a debt owed to another succeeds to the rights of the other with respect to the debt paid. *Id.* at 705. Subrogation can be "equitable" or "conventional." *Id.* at 706. Equitable subrogation is "a creature of chancery that is utilized to prevent unjust enrichment," and its application depends on the equities of the particular case. *Id.* Conventional subrogation, by contrast, is contractually based: it arises from an agreement between the parties to the later-recorded mortgage that the subrogee will pay a debt on behalf of a third party and, in return, be able to assert the rights of the original creditor. *Id.*; see *Union Planters Bank*, 341 Ill. App. 3d at 925.

¶ 30    Here, we address only conventional subrogation. For it to apply, (1) there must be an express agreement to the effect that the party paying the debt on behalf of the third party will be able to assert the rights of the original creditor, (2) the loan proceeds were used to refinance the mortgage(s) as to which the lender seeks subrogation, (3) no harm will come to an innocent third party if the lender is granted priority, and (4) there has been no gross negligence. *Union Planters Bank*, 341 Ill. App. 3d at 925.

¶ 31    We address each requirement. First, we conclude that there was an express agreement between BankUnited and the Zarkhins to the effect that, having paid off the Harris and Homecomings mortgages, BankUnited would be subrogated to the rights of the two senior lenders to the extent of its loan to the Zarkhins.

¶ 32    Paragraph 4, on which plaintiff relies, is indistinguishable from the language that we found sufficient in *Aames*. There, the agreement between the mortgagors and the lender-mortgagee provided that the mortgagors were to discharge any lien that had priority over the mortgage, that the lender would pay any sums secured by a lien that had priority over the mortgage, and that any such sum paid would become additional debt secured by the mortgage. *Aames*, 315 Ill. App. 3d at 708. We held that this language was sufficient to show conventional subrogation. We held that, although nothing in the document stated specifically that it was a first mortgage, the pertinent provisions, when read together, showed that the parties had agreed that the lender's mortgage would have first priority. *Id.* We noted that, under *Bierstadt*, no express statement that the mortgage would be a first mortgage was needed. *Id.*; see *Bierstadt*, 168 Ill. at 624-25.

¶ 33    Here, paragraph 4 required the Zarkhins, as mortgagors, to discharge promptly any lien that had priority over the BankUnited mortgage. As the BankUnited settlement statement showed, the Zarkhins paid off the Harris and Homecomings liens with the proceeds of the

BankUnited loan and further funds supplied by Countrywide, just as Anatoly in his deposition explained had been contemplated. And Harris and Homecomings promptly recorded the releases of their liens, as contemplated by BankUnited and the Zarkhins. The parties clearly intended that BankUnited and Countrywide would lend the Zarkhins the money needed to pay off the two senior liens and that Countrywide would lend the Zarkhins a sufficient amount to discharge the BN mortgage lien as well. Thus, BankUnited would step into the shoes of Harris and Homecomings, although only up to the amount of its loan.

¶ 34     It is true that BankUnited's loan did not fully cover *both* the Harris and Homecomings liens. As a general rule, partial subrogation is improper because it would " 'divid[e] the security between the original obligee and the subrogee, imposing unexpected burdens and potential complexities of division of the security and marshaling upon the original mortgagee.' " *United Community Bank*, 2012 IL App (4th) 110973, ¶ 65 (quoting Restatement (Third) of Prop.: Mortgages § 7.6 cmt. a (1997)). However, "this general rule does not require the subrogee to pay the entire debt, so long as the entire debt has been paid by some other source." *Ray v. Donohew*, 352 S.E.2d 729, 737 (W. Va. 1986); see *Brown v. Thompson*, 128 S.E. 309, 311-12 (W. Va. 1925). It stands to reason that, when the entire debt has been paid, even if not completely out of funds supplied by the would-be subrogee, the rights of the original obligee against the debtor will not be endangered. See *Western Coach Corp. v. Rexrode*, 634 P.2d 20, 24 (Ariz. Ct. App. 1981) ("[t]he sole purpose of requiring full payment by the guarantor is to protect the creditor from having the exercise of his rights against the debtor impaired by the guarantor's exercise of subrogation rights"); *United States Fidelity & Guaranty Co. v. Maryland Casualty Co.*, 352 P.2d 70, 76 (Kan. 1960) (partial-payment rule exists for benefit of original obligee and will not be invoked where partial subrogation would not impair original obligee's rights). We agree with plaintiff that there is no reason to invoke the bar against partial subrogation where the Harris and Homecomings liens were paid fully, albeit partly with money from Countrywide. Moreover, Countrywide has never claimed any subrogation right.

¶ 35     Bekkerman quotes Anatoly's deposition testimony at length to establish that his intent was to use the combined proceeds of the BankUnited loan and the Countrywide loan to pay off the Harris, Homecomings, and BN mortgage loans in full. Bekkerman notes that Anatoly deviated from his intent to pay off the BN mortgage when he spent the remainder of the Countrywide loan on his business instead. While this is so, we fail to see how it undermines the trial court's judgment. Instead it reinforces plaintiff's contention that the BankUnited loan was intended to refinance the Harris and Homecomings mortgages and thus to bring about the releases of those two mortgages, which is exactly what happened in short order. That the Zarkhins failed to follow through by paying off the BN mortgage with the proceeds of a separate loan from a different lender does not undermine plaintiff's reading of the BankUnited mortgage and the intent of the parties thereto. As plaintiff notes, Bekkerman was not a party to the BankUnited mortgage and does not claim to have been a third-party beneficiary with standing to enforce it. The Zarkhins' subsequent conduct does not negate the clear intent of their agreement with BankUnited.

¶ 36     We turn to whether Bekkerman would be unfairly harmed by allowing plaintiff to be subrogated to the rights of Harris and Homecomings. We agree with the trial court that there would be no unfair harm. Bekkerman was on notice from the outset that the BN mortgage was inferior to the Harris and Homecomings mortgages. It was recorded later and stated explicitly

that it was junior to the Homecomings mortgage. Thus, when the Zarkhins used the BankUnited loan (and part of the Countrywide loan) to pay off the two senior liens, BankUnited simply took the place of two lienholders who had been ahead of Bekkerman. The two senior liens would have been ahead of the BN mortgage lien had BankUnited not acted. Bekkerman's argument is no stronger than the one that we rejected in *Union Planters Bank*, 341 Ill. App. 3d at 927. Indeed, given the explicit subordination of the BN mortgage to the Homecomings mortgage, the assertion of unfair prejudice is, if anything, even weaker here. To deny subrogation would provide a windfall to Bekkerman. See *Aames*, 315 Ill. App. 3d at 709.

¶ 37     We turn to the fourth issue: whether plaintiff was grossly negligent. Bekkerman contends that plaintiff was grossly negligent for failing to conduct a title search that would have revealed the existence of the BN mortgage and for its consequent failure to request "a subrogation of [Bekkerman's] interest."

¶ 38     Bekkerman cites no authority on the entire issue of gross negligence, much less authority to support its claim that plaintiff failed to prove its lack of gross negligence. (Admittedly, plaintiff cites no case law on this issue either.) Because Bekkerman has failed to support its claim of error with any legal authority (or more than cursory analysis), we could hold that this argument is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill. 2d 389, 400-01 (1987). In any event, however, we cannot say that the court erred in this respect.

¶ 39     We agree with plaintiff that Bekkerman's argument is tantamount to contending that conventional subrogation itself is gross negligence. Were a request to an intervening lender for permission to subrogate a prerequisite to conventional subrogation, there would be little if any vitality to the doctrine. No authority states that a lender who wishes to succeed to the priority of a senior mortgagee must accommodate an intervening mortgagee. Indeed, in *UnionBank v. Thrall*, 374 Ill. App. 3d 785 (2007), we held that a lender who in 2001 refinanced its 1996 mortgages and released those mortgages was entitled to priority over another lender whose liens had attached in 1999. The intervening lender argued that the lender should have asked it to subordinate its 1999 liens. We held that the law simply did not require any such request for subordination. *Id.* at 795. Finally, we note that plaintiff's mortgage would not have endangered Bekkerman's interest at all had the Zarkhins acted in accordance with the original intention of both parties (a point that Bekkerman not only concedes but emphasizes).

¶ 40     Plaintiff argues in the alternative that, because Bekkerman did not properly record the description of the property until after plaintiff recorded its mortgage, its lien had priority even under the first-in-time doctrine. Given our disposition of this appeal, we do not consider the argument.

¶ 41                                    III. CONCLUSION

¶ 42     For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 43     Affirmed.