# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*United Community Bank v. Prairie State Bank & Trust*, 2012 IL App (4th) 110973

| | |
|---|---|
| Appellate Court Caption | UNITED COMMUNITY BANK, a Banking Corporation; and JAMES G. McDONOUGH, Plaintiffs-Appellants, v. PRAIRIE STATE BANK & TRUST, an Illinois Banking Corporation, Defendant-Appellee, and SANTARELLI AND SONS, INC., Defendant. |
| District & No. | Fourth District<br>Docket No. 4-11-0973 |
| Argued<br>Filed | June 19, 2012<br>July 11, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where defendant builder's construction mortgage for certain property was recorded before defendant bank recorded the money judgment it obtained against the builder, and then the builder entered into a purchase contract for the property that was not recorded, equitable conversion arising from the unrecorded purchase contract did not operate to completely negate defendant bank's judgment lien; however, plaintiff bank, as mortgagee for the purchaser, had priority over defendant bank pursuant to the doctrine of equitable subrogation to the extent of the loan proceeds advanced to discharge the construction mortgage. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 08-MR-563; the Hon. Tim P. Olson, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on Appeal

E.C. Eberspacher and Dustin L. Probst, both of Dove & Dove, of Shelbyville, and William L. Sauerwein (argued) and Brandon S. Rothkopf, both of Sauerwein Simon P.C., of Springfield, for appellants.

Mariann Pogge (argued), of Springfield, for appellee Prairie State Bank & Trust.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices Steigmann and Cook concurred in the judgment and opinion.

## OPINION

¶ 1   Plaintiffs are James G. McDonough and United Community Bank. Defendant is Prairie State Bank & Trust. The proceedings in trial court had an additional defendant, Santarelli and Sons, Inc. (Santarelli), but Santarelli is not a party to this appeal.

¶ 2   McDonough borrowed funds from United Community Bank to buy a duplex from Santarelli, and McDonough mortgaged the duplex to United Community Bank as security for the loan. But, apparently unbeknownst to McDonough and United Community Bank as well as to the title insurer, Commonwealth Title Insurance Company (Commonwealth), the duplex already was encumbered by a duly recorded judgment lien in favor of Prairie State Bank as a result of a money judgment it had won against Santarelli. So, in the order of recording, Prairie State Bank's judgment lien came first, and United Community Bank's mortgage came next. But the earliest recorded lien of all was a construction mortgage that Santarelli had granted to Illinois National Bank.

¶ 3   In between the recording of the construction mortgage and the recording of the judgment lien, Santarelli and McDonough entered into their purchase contract–but they did not record the purchase contract. Despite the absence of the purchase contract from the public records of title, plaintiffs contended to the trial court that, by operation of equitable conversion, Prairie State Bank acquired no interest in the duplex when recording its judgment lien, because the moment Santarelli and McDonough signed the (unrecorded) purchase contract, Santarelli's interest in real property was equitably converted to an interest in the promised purchase money; thus, from that moment on, he no longer owned a duplex to which the judgment lien could attach. Alternatively, plaintiffs argued that because the loan from United Community Bank was used to pay off the earliest lien of all, the construction mortgage, United Community Bank was equitably subrogated to Illinois National Bank, stepping into its shoes as the senior lienholder.

¶ 4   The trial court denied plaintiffs' motion for summary judgment and granted Prairie State Bank's cross-motion for summary judgment (Santarelli was defaulted). The reason was that

Commonwealth, which the court considered to be the real party in interest, had made an error in its title search, overlooking Prairie State Bank's judgment lien. Because of this mistake by Commonwealth, the court rejected both theories advanced by plaintiffs: equitable conversion as well as equitable subrogation. Plaintiffs appeal.

¶ 5		In our *de novo* review (*A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 22; *City of McHenry v. Suvada*, 2011 IL App (2d) 100534, ¶ 6), we affirm the trial court's judgment in part and reverse it in part. We conclude the court was correct in rejecting plaintiffs' argument that, by operation of equitable conversion, Santarelli had no interest in the duplex to which Prairie State Bank's judgment lien could attach, so as to completely negate the judgment lien. That would have been the case only if the purchase contract were recorded before Prairie State Bank recorded its judgment lien or only if Prairie State Bank otherwise had received notice of the purchase contract. We disagree with the court, however, that Commonwealth's apparent mistake in the title search, *i.e.*, failing to discover Prairie State Bank's judgment lien, defeats United Community Bank's right of equitable subrogation. By law, United Community Bank has priority over Prairie State Bank to the extent of $146,852.50, the amount of the loan proceeds used to discharge the senior encumbrance, the construction mortgage.

¶ 6		                                    I. BACKGROUND

¶ 7		Specifically, the facts in this case are as follows. Santarelli owned some real estate in Bogey Hills Estates, Third Addition, in Springfield. On May 5, 2005, Santarelli mortgaged this real estate to Illinois National Bank, to secure a construction loan. The construction mortgage was recorded on May 12, 2005.

¶ 8		On April 5, 2007, Santarelli and McDonough signed a contract (the purchase contract), in which Santarelli agreed to sell to McDonough, for $155,000, a portion of the real estate which was improved with a duplex and which was commonly known as 4410 Castle Pines Drive. In the purchase contract, Santarelli agreed to obtain title insurance.

¶ 9		On June 27, 2007, United Community Bank wrote McDonough that it was willing to lend him the funds necessary for his purchase of 4410 Castle Pines Drive, subject to some "terms and conditions," including "[a] Title Commitment in the amount of the purchase price indicating no *** liens or encumbrances other than those to be paid from the proceeds of the sale."

¶ 10		On July 24, 2007, Prairie State Bank won a judgment against Santarelli in the amount of $634,488.39 plus costs, and on July 26, 2007, Prairie State Bank recorded a memorandum of this judgment. At the time Prairie State Bank recorded the memorandum of judgment, the purchase contract between Santarelli and McDonough was still executory and unrecorded, and Prairie State Bank had no knowledge of the purchase contract.

¶ 11		On September 6, 2007, Commonwealth issued a commitment for title insurance in the amount of $155,000 on 4410 Castle Pines Drive, listing McDonough and United Community Bank as the proposed insureds. The commitment included a "Schedule B," which stated that the title insurance policy would contain exceptions to coverage, including the construction mortgage in favor of Illinois National Bank. The exceptions, however, did not include Prairie

State Bank's memorandum of judgment.

¶ 12    On September 27, 2007, Santarelli's sale of 4410 Castle Pines Drive to McDonough was closed, and McDonough executed a mortgage on this property in favor of United Community Bank, to secure its loan. In paragraph 4 of the mortgage, McDonough promised to "promptly discharge any lien which ha[d] priority over this Security Instrument." Accordingly, on that same day (September 27, 2007), $146,852.50 of the loan proceeds were used to discharge the construction mortgage in favor of Illinois National Bank.

¶ 13    On October 5, 2007, Commonwealth issued two policies of title insurance: one to McDonough in the amount of $155,000 and the other to United Community Bank in the amount of $156,335.20. The policies provided that, subject to exclusions from coverage, Commonwealth agreed to insure from loss resulting from (among other things) "[a]ny lien or encumbrance on the title." Commonwealth further agreed to "pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured." Each policy contained a "Schedule B" stating that the policy did not insure against loss or damage resulting from certain encumbrances listed therein. Prairie State Bank's memorandum of judgment was not on the list in "Schedule B" of either policy.

¶ 14    On October 9, 2007, two documents were recorded: (1) McDonough's mortgage of 4410 Castle Pines Drive to United Community Bank, securing a debt in the face amount of $156,335.20; and (2) a warranty deed, in which Santarelli conveyed 4410 Castle Pines Drive to McDonough.

¶ 15    On October 11, 2007, a release of the construction mortgage in favor of Illinois National Bank was recorded.

¶ 16    In September 2008, United Community Bank and McDonough filed a complaint for declaratory judgment against Prairie State Bank and Santarelli. In count I, plaintiffs sought a declaratory judgment that conventional subrogation "voided" Prairie State Bank's judgment lien or, alternatively, made United Community Bank's lien superior to that of Prairie State Bank. In count II, they invoked equitable subrogation, seeking a declaratory judgment that McDonough's ownership of 4410 Castle Pines Drive was "free and clear" of Prairie State Bank's judgment lien. In count III, they sought indemnity from Santarelli in the event that Prairie State Bank's judgment lien were "determined to be a lien against [4410 Castle Pines Drive]."

¶ 17    Prairie State Bank pleaded affirmative defenses. In their reply to one of these affirmative defenses, plaintiffs admitted that Commonwealth was "funding this litigation against Prairie State Bank pursuant to its obligations under [the title insurance policies]"; nevertheless, in their reply, plaintiffs disputed the materiality of this fact.

¶ 18    In September 2009, the trial court entered a default judgment against Santarelli and in plaintiffs' favor, ordering Santarelli to indemnify plaintiffs if either of them had to pay any monies to Prairie State Bank as a result of a judgment against plaintiffs on either count I or II of their complaint.

¶ 19    In July 2010, plaintiffs filed a motion for summary judgment on counts I and II, and in December 2010, Prairie State Bank filed a cross-motion for summary judgment on those counts.

¶ 20    In August 2011, the trial court denied plaintiffs' motion for summary judgment and granted Prairie State Bank's cross-motion for summary judgment. In its summary-judgment order, the court said it was "misfeasance" on the part of Commonwealth to miss Prairie State Bank's judgment lien in the title search and that this "misfeasance [had] created the situation." "Had they competently done their job," the court said, "the contingency would not [have] been met and the sale would not have closed. No harm to anyone." (The court did not specify which "contingency" it meant.) In the court's view, Commonwealth was "financing the litigation in order to avoid the consequences of [its] misfeasance."

¶ 21    In this connection, the trial court found a case from Indiana to be persuasive, *Lawyers Title Insurance Corp. v. Capp*, 369 N.E.2d 672 (Ind. Ct. App. 1977). A federal case that Prairie State Bank had cited to the trial court, *First Federal Savings Bank of Wabash v. United States*, 118 F.3d 532, 534 (7th Cir. 1997), relied on *Capp* in holding that equitable subrogation should not be used to "benefit a negligent *** insurer." The trial court in the present case said:

> "The Court believes the Indiana Court makes more sense, and the Court will consider the complete picture, including what the insurance company is trying to accomplish.
>
> The Court does not see how the actual plaintiffs will be harmed. The insurance company will in all likelihood be required to compensate plaintiffs pursuant to the contract of insurance with them. No party will be out anything.
>
> Therefore, as between the parties, this Court does not believe equity requires the Court to invoke the doctrines [of equitable conversion and equitable subrogation] as put forth by plaintiffs. To do so would only reward a negligent non-party. Just doesn't seem fair."

Consequently, the court granted Prairie State Bank's motion for summary judgment and denied plaintiffs' motion for summary judgment.

¶ 22    In September 2011, plaintiffs filed a motion for reconsideration, insisting, *inter alia*, that they were innocent and that it was erroneous to impute to them any negligence on the part of an independent third party, Commonwealth.

¶ 23    In October 2011, the trial court denied plaintiffs' motion for reconsideration, stating that, contrary to their argument, plaintiffs were not "completely innocent." The court reasoned: "The lender and buyer had an obligation to conduct a reasonable search of the record. The fact that they delegated that responsibility to a negligent third party does not relieve them of that responsibility. At the very least, plaintiffs are somewhat vicariously responsible."

¶ 24    The trial court appeared to take the view that, through Commonwealth, plaintiffs were responsible for causing a sale to take place that never should have taken place. The court remarked: "The contract contained condition precedents [*sic*] that obviously had not been met at the time that defendant filed of record its lien. But for the negligence of the hired title insurance company, these condition precedents [*sic*] would not have occurred and the sale never would have taken place." Apparently, in this context, the "contract" was the purchase contract, but the court did not specify which conditions precedent it meant.

¶ 25    The trial court concluded:

"This didn't pass the Court's smell test before, and doesn't pass now. Equity does not require this Court [to] wash the dirty hands of the title insurance company.

Motion to reconsider is denied."

¶ 26 This appeal followed.

¶ 27 II. ANALYSIS

¶ 28 A. Nonjoinder of Commonwealth

¶ 29 Plaintiffs argue that, given the trial court's remark that "[t]he insurance company will in all likelihood be required to compensate plaintiffs pursuant to the contract of insurance with them," the insurance company, *i.e.*, Commonwealth, was a necessary party and its nonjoinder is reason to reverse the judgment and remand the case for new proceedings–which, this time, should include Commonwealth as a defendant. The only authority that plaintiffs offer in support of this argument is the following language from section 2-405(a) of the Code of Civil Procedure (735 ILCS 5/2-405(a) (West 2010)): "Any person may be made a defendant *** against whom a liability is asserted either jointly, severally or in the alternative arising out of the same transaction ***."

¶ 30 For two reasons, this language from section 2-405(a) lends no support to plaintiffs' argument that Commonwealth is a necessary party. First, the quoted language says nothing about necessary parties; instead, it discusses who "may" be joined as a defendant. 735 ILCS 5/2-405(a) (West 2010). Second, by remarking that Commonwealth "[would] in all likelihood be required to compensate plaintiffs pursuant to the contract of insurance with them," the trial court merely made a prediction; the court did not "assert liability." Courts determine, rather than assert, liability. Parties assert liability by making claims against one another in complaints. It does not appear that any of the parties in this case filed a complaint asserting liability against Commonwealth. Thus, we are unconvinced that Commonwealth was a necessary party.

¶ 31 B. Equitable Conversion

¶ 32 1. *As to Prairie State Bank, the Ineffectuality of the Unrecorded Purchase Contract*

¶ 33 Prairie State Bank contends that because it recorded its memorandum of judgment before the recording of either the purchase contract between McDonough and Santarelli, the deed to McDonough, or the mortgage to United Community Bank, Prairie State Bank's judgment has priority over the contract, deed, and mortgage and is not subject to them. See 765 ILCS 5/30 (West 2010); *Farmers State Bank v. Neese*, 281 Ill. App. 3d 98, 106 (1996).

¶ 34 Plaintiffs argue, on the other hand, that "the Illinois (and majority) Common Law Doctrine of Equitable Conversion, as is that of conventional and equitable subrogation, is an exception to 'first in time, first in right' "and that "[t]he Illinois Appellate Court has so held in [*Union Planters Bank, N.A. v. FT Mortgage Cos.*, 341 Ill. App. 3d 921 (2003)]." It is true that, in *Union Planters*, 341 Ill. App. 3d at 925, the appellate court said: "The concept of *subrogation* is an exception to the 'first in time, first in right' rule." (Emphasis added.)

Nowhere in *Union Planters*, however, did the appellate court mention *equitable conversion*.

¶ 35 What is equitable conversion? It is an application of a general principle of equity: "equity regards and treats as done what ought to be done." 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 368, at 685 (4th ed. 1918). Equitable conversion applies that general principle to the sale of land. Assume that a vendor and a vendee enter into a binding contract for the sale of land but the vendee has not yet paid the purchase price to the vendor and the vendor has not yet delivered a deed to the vendee. In other words, the contract is still executory. "By the terms of the contract the land ought to be conveyed to the vendee and the purchase price ought to be transferred to the vendor; equity therefore regards these as done: the vendee as having acquired the property in the land, and the vendor as having acquired the property in the price." *Id.* at 686. As a result, although the vendee as of yet lacks "the confirmation of legal title for purposes of security against third persons," the vendee enjoys "all the incidents of a real ownership": for example, he may convey the land, encumber it, and devise it by will. *Id.* at 687. Insomuch as the vendor's heirs, devisees, and grantees have "notice" of the executory contract, it binds them, and as far as they are concerned, the vendor no longer has an interest in the land but instead has only a personal-property interest in the purchase money. *Id.*

¶ 36 So, it appears that, at common law, the equitable conversion was effective only as to those with notice of the executory contract. Pomeroy writes that if, after entering into the contract with the vendee, the vendor conveys the land to "a third person who is a *bona fide* purchaser for value without notice ***[,] equitable principles come into play, and cut off the vendee's equitable estate." *Id.* at 687-88. Likewise, Story writes that the "lien of the vendor [in the amount of the unpaid purchase money] exists against the vendee and against volunteers and purchasers under him *with notice*" but that "it does not exist against purchasers under a conveyance of the legal estate made bona fide for a valuable consideration *without notice*, if they have paid the purchase-money." (Emphases added.) 2 Joseph Story, Commentaries on Equity Jurisprudence § 1228, at 575 (13th ed. 1886).

¶ 37 One can give constructive notice of an interest in land by recording the corresponding instrument "in the county in which such real estate is situated." 765 ILCS 5/28 (West 2010). Absent such recording, unless a "creditor[ ] [or] subsequent purchaser[ ]" otherwise has "notice" of the executory contract by which the vendee acquired an equitable interest in the land, that contract is a nullity as to the "creditor[ ] [or] subsequent purchaser[ ]," according to section 30 of the Conveyances Act (765 ILCS 5/30 (West 2010)). Section 30 provides:

"All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30 (West 2010).

The purchase contract between Santarelli and McDonough is "authorized to be recorded," considering that it is an instrument relating to or affecting title to real estate in Illinois. Section 28 of the Conveyances Act (765 ILCS 5/28 (West 2010)) provides: "Deeds,

mortgages, powers of attorney, and other instruments relating to or affecting the title to real estate in this state, shall be recorded \*\*\*." Like any other document creating an ownership interest in land, the purchase contract becomes a legal reality for "creditors and subsequent purchasers" only from the date it is recorded, unless they otherwise receive "notice" of it. A judgment creditor is a "creditor" within the meaning of section 30 (765 ILCS 5/30 (West 2010)). *East St. Louis Lumber Co. v. Schnipper*, 310 Ill. 150, 159 (1923). The record appears to contain no evidence that the judgment creditor in this case, Prairie State Bank, had notice of the purchase contract between Santarelli and McDonough when Prairie State Bank recorded its memorandum of judgment on July 26, 2007. Joseph Hardy, the president of Prairie State Bank, averred in an affidavit that Prairie State Bank had no knowledge of the purchase contract at any time prior to September 27, 2007. The purchase contract was unrecorded when Prairie State Bank recorded its memorandum of judgment. Consequently, McDonough's equitable ownership of the land (by virtue of his unrecorded, executory purchase contract with Santarelli) was void as to Prairie State Bank, and as far as Prairie State Bank was concerned, Santarelli was both the legal and equitable owner of the land. See *Farmers State Bank*, 281 Ill. App. 3d at 104. When Prairie State Bank recorded its memorandum of judgment, the judgment became a lien on Santarelli's real estate, and because Prairie State Bank had no notice of the purchase contract, the real estate was Santarelli's for purposes of Prairie State Bank. See 735 ILCS 5/12-101 (West 2010); 765 ILCS 5/30 (West 2010).

¶ 38        Plaintiffs insist, to the contrary, that by recording its memorandum of judgment against Santarelli, Prairie State Bank acquired a lien only on any real estate that Santarelli owned, not on his personal property. See 735 ILCS 5/12-101 (West 2010). Plaintiffs reason that because Santarelli and McDonough already had executed their purchase contract when Prairie State Bank recorded its memorandum of judgment, Prairie State Bank did not acquire a lien on 4410 Castle Pines Drive, because in order for Prairie State Bank to have acquired a lien on that land, Santarelli would have had to own it at that time–and by operation of the doctrine of equitable conversion, he no longer owned it; his interest in 4410 Castle Pines Drive had been equitably converted to an interest in the promised purchase money, which was personal property.

¶ 39        Again, the fallacy of this reasoning lies in its assumption that the unrecorded purchase contract was effective as to Prairie State Bank. Equitable conversion happened only by virtue of the purchase contract–which, unrecorded, was void as to Prairie State Bank. See 765 ILCS 5/30 (West 2010); *Farmers State Bank*, 281 Ill. App. 3d at 104. If, from the standpoint of Prairie State Bank, there was no purchase contract, there was no equitable conversion. Although it is quite true that equitable conversion was a legal reality for Santarelli, McDonough, and anyone else with notice of the purchase contract, section 30 of the Conveyances Act as well as common-law principles of equity (Pomeroy, *supra*, § 368, at 687-88; Story, *supra*, § 1228, at 575) lead to the conclusion that the equitable conversion was not a legal reality for Prairie State Bank, which lacked notice. It did not appear, from the records of the Sangamon County recorder of deeds, that McDonough had any claim on Santarelli's land at the time Prairie State Bank filed its memorandum of judgment. The appellate court has held: "A judgment becomes a lien on all real property appearing of record

free from the claims of all other persons of which the judgment creditor had no notice, either actual or constructive, and when there is not such notice of an unrecorded deed, the lien will not be affected by the subsequent recording thereof." *Commercial Trust & Savings Bank of Springfield v. Murray*, 246 Ill. App. 355, 359 (1927). Thus, the unrecorded purchase contract and the equitable conversion it created had no effect on Prairie State Bank's judgment lien. Prairie State Bank acquired a lien on 4410 Castle Pines Drive free of McDonough's equitable claim.

¶ 40          2. *How the Cases on Which Plaintiffs Rely Are Distinguishable*

¶ 41                  a. *Shay* and *Farmers State Bank*

¶ 42      Plaintiffs cite *Shay* and *Farmers State Bank* to demonstrate that Illinois courts recognize and apply the doctrine of equitable conversion. The real question, though, is not whether the doctrine of equitable conversion exists in Illinois law–clearly it does. Instead, the real question is whether equitable conversion is effective as to a judgment creditor without notice. The answer is no. Neither *Shay* nor *Farmers State Bank* purports to exempt equitable conversion from the rule that an unrecorded instrument is void as to creditors lacking notice of that instrument. See 765 ILCS 5/30 (West 2010).

¶ 43                  b. *East St. Louis Lumber*

¶ 44      Another case that plaintiffs discuss, *East St. Louis Lumber*, 310 Ill. at 157, holds that *resulting trusts* have force even though they are not recorded. Let us look closely at the facts and rationale of *East St. Louis Lumber* to determine whether its holding applies to *equitable conversions* as well.

¶ 45      East St. Louis Lumber Company bought three parcels of real estate, but the deeds were made to the company's general manager, M.C. Reis. *Id.* at 152. The company requested Reis to convey title to it, but Reis refused to do so, because he had signed some notes and obligations for the company and he wanted to hold title to the real estate "as security against any liability that might accrue on such notes and obligations." *Id.* at 152-53.

¶ 46      Reis also had signed as surety on a recognizance. *Id.* at 153. The Shelby County circuit court found this recognizance to have been forfeited, and it entered a judgment against Reis in the amount of $6,500. *Id.* The State proceeded to collect this $6,500 out of the three parcels of real estate, for which the company had paid but which were titled in Reis's name. *Id.*

¶ 47      The company filed a complaint requesting a declaratory judgment that the three parcels were actually its own property, even though Reis held record title; that Reis was obliged to convey these parcels to the company; and that the levy of the execution in the state's favor upon the judgment against Reis should be removed as a cloud upon the company's title. *Id.* at 152. The company argued to the chancellor that because it had paid the consideration for the three parcels, the law implied a trust: even though, on paper, Reis was the legal owner of the parcels, the company was the equitable owner, and Reis held the parcels in trust for the company. *Id.* at 155. The chancellor agreed there was a resulting trust, but he was

concerned that this trust, an interest in land, was hidden from public view. It was, as he put it, a " 'secret trust,' " and he did not think a court of equity should enforce such unrecorded, covert interests in land against the public. *Id.* So, the chancellor dismissed the company's complaint, "for want of equity." *Id.* at 156.

¶ 48 The supreme court reversed. *Id.* at 160. The supreme court reasoned that, at common law, "a judgment was not a lien upon real estate"–let alone real estate to which the judgment debtor held only the naked legal title, with the entire equitable estate vested in someone else. *Id.* at 156. Because the State had no common-law right to collect its judgment out of the three parcels of real estate, the State had to point to some statute authorizing it to do so. And this statute had to authorize not only the collection of the judgment out of real estate, but collection out of real estate equitably owned by someone other than the judgment debtor. *Id.* at 157.

¶ 49 The supreme court acknowledged that, potentially, section 30 of the Conveyances Act (now 765 ILCS 5/30 (West 2010)) was such a statute. Under section 30, "a judgment [might] have priority over the actual owner of the land if he [were] without notice, either by a record or otherwise, of the right of such owner." *East St. Louis Lumber*, 310 Ill. at 157. But that would be the case only if this covert ownership in land arose by virtue of an "instrument[ ] required to be recorded." *Id.* See 765 ILCS 5/30 (West 2010) ("All deeds, mortgages and other instruments of writing which are *authorized to be recorded*, shall take effect and be in force from and after the time of filing the same for record, and not before ***." (Emphasis added.)). The supreme court reasoned that because section 9 of the Statute of Frauds (now the Frauds Act (740 ILCS 80/9 (West 2010))) exempted resulting trusts from the requirement of being in writing, resulting trusts were likewise exempt from the requirement of being recorded. *East St. Louis Lumber*, 310 Ill. at 157. See 740 ILCS 80/9 (West 2010) ("All declarations or creations of trusts or confidences of any lands, tenements or hereditaments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will in writing; or else they shall be utterly void and of no effect: *Provided, that resulting trust or trusts created by construction, implication or operation of law, need not be in writing, and the same may be proved by parol*." (Emphasis added.)). In short, because resulting trusts did not have to be in writing in the first place (and normally, by their very nature, they were not), one could not logically require their recordation.

¶ 50 Resulting trusts were created by operation of law, independently from any contract, and hence they did not have to be recorded. The supreme court explained:

"A resulting trust is created by implication or operation of law *apart from any contract*, based *only* on the fact that land has been purchased with the money of one and a deed made to another. The existence of such a trust need not be evidenced by any writing and is not within the recording law." (Emphases added.) *East St. Louis Lumber*, 310 Ill. at 157.

To put it differently, resulting trusts are outside the recording law because *there is nothing to record*. Recording the deed would not give the public notice of the resulting trust, because the equitable owner of the land is someone other than the grantee named in the deed.

¶ 51    In the present case, by contrast, the purchase contract, if it were recorded, would have plainly showed the true state of affairs: it names McDonough as the buyer–and, as such, the equitable owner–of 4410 Castle Pines Drive. For that very reason, the purchase contract creates an equitable conversion, not a resulting trust. When plaintiffs characterize *East St. Louis Lumber* as "a case remarkably on point with the facts of our instant case," they overlook this distinction between equitable conversion and a resulting trust. Plaintiffs say: "[In *East St. Louis Lumber*, the supreme court] recognized that equitable conversion acts to defeat a judgment lien claim arising after a sale is made." On the contrary, the supreme court never mentions equitable conversion in *East St. Louis Lumber*. Instead, the supreme court discusses resulting trusts.

¶ 52    Admittedly, courts and commentators sometimes use the language of trusts when describing equitable conversion. Pomeroy says, for example, that while the contract is executory, the vendee has an equitable estate in the land and although the vendor still owns the legal estate, the vendor holds it as a trustee for the vendee, while having a lien on the land as security for any unpaid portion of the purchase price. Pomeroy, *supra*, § 368, at 686. See also *Carollo v. Irwin*, 2011 IL App (1st) 102765, ¶ 22. Equitable conversion bears a superficial resemblance to a resulting trust in that, in a resulting trust, the person whose name is on the deed (the owner of the legal title) holds the land in trust for the equitable owner (the person who paid the consideration). See *East St. Louis Lumber*, 310 Ill. at 155, 157-58.

¶ 53    Equitable conversion, though, is significantly different from a resulting trust in that "[a] resulting trust is created by *** operation of law apart from any contract" (*id.* at 157), whereas equitable conversion results from an agreement. As Pomeroy says, "*[b]y the terms of the contract* the land ought to be conveyed to the vendee, and the purchase price ought to be transferred to the vendor; equity therefore regards these as done." (Emphasis added.) Pomeroy, *supra*, § 368, at 686. In the case of a resulting trust, there is nothing to record that would give the public notice of the resulting trust, whereas, in the case of equitable conversion, there is something to record that would give the public notice of the equitable conversion, namely, the executory purchase contract–which, unlike a resulting trust, is within the Frauds Act, often referred to as the Statute of Frauds. See 740 ILCS 80/2 (West 2010) ("No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party.").

¶ 54    Therefore, we conclude that the supreme court's holding in *East St. Louis Lumber*, 310 Ill. at 157, that resulting trusts are "not within the recording law" is inapplicable to the significantly different doctrine of equitable conversion. Equitable conversion, unlike a resulting trust, is not "created by implication or operation of law apart from any contract." *Id.* Rather, equitable conversion results from an executory contract for the sale of land, and such a contract is an instrument that is "authorized to be recorded." 765 ILCS 5/30 (West 2010).

¶ 55                                  c. *Cannefax*

¶ 56    Because Santarelli and McDonough did not record their executory purchase contract before Prairie State Bank recorded its memorandum of judgment, another case on which plaintiffs rely, *Cannefax v. Clement*, 786 P.2d 1377 (Utah Ct. App. 1990), is distinguishable. In *Cannefax*, the vendee "recorded a notice of her [executory] uniform real estate contract" before the third party obtained a judgment against the vendor. *Id.* at 1378.


¶ 57                            C. Equitable Subrogation

¶ 58                    1. *The Asserted Forfeiture of This Theory*

¶ 59    In their original brief, plaintiffs argue against a case on which Prairie State Bank relied in trial court, *First Federal*, and in the course of distinguishing and refuting that case, plaintiffs argue that United Community Bank is "subrogate[d] into the shoes of the priority holder on the home occupied by McDonough." They argue equitable subrogation at greater length in their reply brief.

¶ 60    Prairie State Bank has filed a motion to strike from plaintiffs' reply brief this argument on equitable subrogation. Quoting Rule 341(h)(7) (Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)) that "[p]oints not argued are waived [(*i.e.*, forfeited)] and shall not be raised in the reply brief," Prairie State Bank contends that when plaintiffs argue, in their reply brief, that they are equitably subrogated to the priority lienholder, Illinois National Bank, plaintiffs are making a new and hence impermissible argument. Equitable subrogation, Prairie State Bank observes, was not one of the issues that plaintiffs listed in the "Issues Presented for Review" in their original brief, and plaintiffs cited equitable-subrogation cases in their original brief only to support their assertions that the trial court had erred by considering the existence of title insurance and by failing to give effect to the doctrine of equitable conversion. Prairie State Bank claims that plaintiffs' argument on equitable subrogation in their original brief is too cursory to satisfy Rule 341(h)(7). See *Bublitz v. Wilkins Buick, Mazda, Suzuki, Inc.*, 377 Ill. App. 3d 781, 787 (2007) ("An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Rule 341(h)(7) and is [forfeited]."); *Del Real v. Northeast Illinois Regional Commuter R.R. Corp.*, 404 Ill. App. 3d 65, 73 (2010) (cursory argument, without reasons, does not satisfy Rule 341(h)(7)).

¶ 61    Granted, equitable subrogation is unmentioned in the "Issues Presented for Review" in plaintiffs' original brief. But it is unclear that specific legal doctrines have to be mentioned in the "Issues Presented for Review." Rule 341(h)(3) says that the "statement of the issue or issues presented for review" shall be "without detail"–for example, "Whether the jury was improperly instructed" (not "Whether the jury was improperly instructed on assumption of the risk, negligence, prior inconsistent statements," and so forth). Ill. S. Ct. R. 341(h)(3) (eff. July 1, 2008). Apparently, Rule 341(h)(3) envisions that the issue will be framed in a general way, such as "Whether the trial court erred in determining the priority of liens" or "Whether the trial court erred by granting defendant's motion for summary judgment and denying plaintiffs' motion for summary judgment."

¶ 62    The specific contentions belong in the "Points and Authorities." See Ill. S. Ct. R. 341(h)(1) (eff. July 1, 2008). A "point" is "[a] pertinent and distinct legal proposition, issue,

or argument." Black's Law Dictionary 1177 (7th ed. 1999). Admittedly, in the "Points and Authorities" of plaintiffs' original brief, none of the points mentions equitable subrogation, even though the proposition that United Community Bank is equitably subrogated to Illinois National Bank certainly qualifies as a "distinct legal proposition"–distinct, that is, from the doctrine of equitable conversion. Should the omission of equitable subrogation from the "Points and Authorities" result in its forfeiture? It appears not, according to case law, provided that the point is argued sufficiently in the "Argument." See, *e.g.*, *Collins v. Westlake Community Hospital*, 57 Ill. 2d 388, 392 (1974); *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 22; *People v. Robinson*, 163 Ill. App. 3d 754, 775 n.2 (1987). The reasoning in those cases is that, under Illinois Supreme Court Rule 341(h)(7), "points not *argued* are waived"; the rule does not say that "points omitted from the Points and Authorities are waived." (Emphasis added.) (Incidentally, the same logic applies to issues omitted from the "Issues Presented for Review": the failure to *argue* issues results in their forfeiture, not the failure to list them in the "Issues Presented for Review." *Robinson*, 163 Ill. App. 3d at 775 n.2.)

¶ 63 Consequently, we ask whether plaintiffs sufficiently argued equitable subrogation in their original brief. Two cases that plaintiffs cite in their original brief, *Union Planters* and *First Federal*, explain what equitable subrogation is. The appellate court says, for instance, in *Union Planters*, 341 Ill. App. 3d at 925: "Subrogation is a method by which one party involuntarily pays a debt of another and succeeds to the right of the other with respect to the debt paid. [Citation.] Subrogation applies in the context of lien priority in that one party is subrogated to the lien priority of another. [Citation.]" See also *First Federal*, 118 F.3d at 533-34. Plaintiffs argue in their original brief that United Community Bank paid off the construction mortgage with the loan proceeds and that "[n]o prejudice [would] result[ ] to [Prairie State Bank] to subrogate into the shoes of the priority holder on the home occupied by plaintiff McDonough." In this context, it is clear that, by "priority holder," plaintiffs mean "Illinois National Bank," the entity that made the construction loan. Thus, plaintiffs have argued clearly enough that United Community Bank is equitably subrogated to Illinois National Bank, and they have explained why United Community Bank is equitably subrogated. We conclude, then, that plaintiffs have sufficiently argued equitable subrogation in their original brief, and therefore we deny Prairie State Bank's motion to strike that issue from plaintiffs' reply brief.

¶ 64 2. *Equitable Subrogation in the Amount of the Prior Encumbrance Paid With the Loan Proceeds*

¶ 65 Prairie State Bank argues, and plaintiffs do not appear to dispute, that if equitable subrogation applies to this case, United Community Bank is subrogated to the mortgage rights of Illinois National Bank only to the extent of $146,852.50, which was the amount paid to Illinois National Bank at closing out of the loan proceeds. Prairie State Bank is correct. See *Detroit Steel Products Co. v. Hudes*, 17 Ill. App. 2d 514, 521 (1958) (the junior encumbrancer, the bank, stood in the shoes of the prior encumbrancers "to the extent they received loan proceeds"); 34 Ill. L. and Prac. *Subrogation* § 8 (2001). This is simply another

way of saying that the new mortgagee is subrogated to the prior mortgagee in whatever amount the prior mortgage was. See also Restatement (Third) of Prop.: Mortgages § 7.6 cmt. a (1997) ("Where subrogation to a mortgage is sought, the entire obligation secured by the mortgage must be discharged. Partial subrogation to a mortgage is not permitted. The reason is that partial subrogation would have the effect of dividing the security between the original obligee and the subrogee, imposing unexpected burdens and potential complexities of division of the security and marshaling upon the original mortgagee.").

¶ 66        D. The Irrelevance of Commonwealth's "Negligence" in the Title Search

¶ 67        The trial court refused to declare that United Community Bank was equitably subrogated to Illinois National Bank, reasoning that allowing equitable subrogation in the circumstances of this case would reward the "misfeasance" or "negligence" of the title insurer, Commonwealth, in failing to discover Prairie State Bank's judgment lien in the title search. We see two problems with the court's rationale.

¶ 68        First, we disagree that Commonwealth's apparent failure to discover Prairie State Bank's judgment lien was either "misfeasance" or "negligence." Those words incorrectly imply that Commonwealth owed a duty to the parties in this case to discover the judgment lien. Commonwealth owed them no such duty. The title search was not a service that Commonwealth was providing to the parties; Commonwealth did the title search for itself. The purpose of the title search was not to provide information to others regarding the title. Instead, the title search had only one purpose: to enable Commonwealth to decide the exceptions to the coverage it was willing to offer. See *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326, 340 (2006). "To the extent that the title commitment contains information concerning the title, such information is provided to give notice of the limitations to the risk that the title insurer is willing to insure." *Id.* at 340-41. Thus, even if, in its title search, Commonwealth actually discovered Prairie State Bank's judgment lien but *consciously and intentionally* omitted that lien from the exceptions to coverage in "Schedule B," that would be Commonwealth's business and no one else's. If Commonwealth wants to insure against losses resulting from Prairie State Bank's judgment lien, Commonwealth is perfectly entitled to do so. In short, Commonwealth prepared a title commitment–nothing more–and anyone wanting information about the title should have obtained an abstract of title. See *First Midwest*, 218 Ill. 2d at 340.

¶ 69        *First Federal* and the Indiana case on which it relies, *Capp*, fail to make this crucial distinction between a title commitment and an abstract of title. In *First Federal*, 118 F.3d at 532, a bank lent money to pay off a first mortgage on the property, securing its loan with a new mortgage on the property, but, as the Seventh Circuit put it, the bank "fail[ed], due to the negligence of its title insurer, to discover an intervening tax lien." The decision, however, contains no mention of an abstract of title. Evidently, the only "negligent failure" was omitting to list the tax lien as an exception to coverage in the title commitment or title insurance policy. The Seventh Circuit refused to allow the bank to be equitably subrogated to the first mortgage, because "Indiana courts"–specifically, *Capp*–"ha[d] been more reluctant to invoke the doctrine of equitable subrogation in cases where to do so would

-14-

benefit a negligent title insurer." *First Federal*, 118 F.3d at 534.

¶ 70    *Capp* penalized a title insurer essentially for agreeing to cover loss resulting from an incorrect survey. In *Capp*, 369 N.E.2d at 673, a buyer of land overpaid the seller $6,900 because a survey of the land erroneously included 45 feet of ground that the seller already had sold to someone else. In an initial commitment for title insurance, the title insurer excepted this 45-foot portion of land from the coverage, but, apparently through error, a second and revised commitment for title insurance made no mention of the 45 feet. *Id.* The buyer was an insured under the title insurance policy, and when the overpayment came to light, the title insurer reimbursed the buyer the $6,900. *Id.* Then, on a theory of equitable subrogation, the title insurer brought an action against the seller to recoup the $6,900. *Id.* The title insurer argued that "as an insurer who ha[d] paid for the damages or debt of a third party, it [was] entitled to step into the shoes of its insured as it would in any normal subrogation case." *Id.* at 674. But the trial court refused to allow the title insurer to step into the buyer's shoes (*id.* at 673), and the Court of Appeals of Indiana upheld that decision, characterizing the omission of the 45 feet from the exceptions in the revised title commitment as "negligence" by the title insurer (*id.* at 674). The Court of Appeals said: "[The buyer] paid and relied on [the title insurer] to search the record and provide an accurate legal description, which [the title insurer] failed to do." *Id.*

¶ 71    This latter quotation highlights the fundamental fallacy of *Capp* and *First Federal* from the perspective of Illinois law. The buyer was *not* entitled to rely on the title commitment for information regarding the title, because the purpose of the title commitment was not to provide information regarding the title; rather, the title commitment had a wholly different, contractual purpose, namely, specifying the losses the title insurer was excluding from coverage in its offer to provide insurance. The title insurer breached no duty to the seller by offering (through its omission of the exception) to cover any loss resulting from the prior conveyance of the 45 feet. So, we decline to follow *First Federal* and *Capp*, because their discussion of the so-called "negligence" of title insurers in omitting encumbrances from the exceptions in title insurance policies is irreconcilable with Illinois law, most notably *First Midwest*. Omitting an encumbrance from the exceptions in a title insurance policy does not defeat a title insurer's right to equitable subrogation, because, rather than being negligence or misconduct, this omission merely is an exercise of the title insurer's freedom of contract. And besides, mere negligence is not "unclean hands" disqualifying one from equitable relief. See *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 103 (2005) ("In determining whether a party acted with unclean hands, the court will look to the intent of the party, not the effect of its actions, and will only find unclean hands present if there has been fraud or bad faith.").

¶ 72    The second problem we have with the trial court's rationale is that we are unclear on the connection between Prairie State Bank's actual priority as a lienholder and the coverage that Commonwealth offers or does not offer to McDonough and United Community Bank. We do not understand the logic of awarding Prairie State Bank a windfall by reason of Commonwealth's apparent mistake in a title search it performed for its own purposes. Listing or not listing Prairie State Bank's judgment lien in the exclusions from coverage in the title insurance policies is irrelevant to Prairie State Bank's priority. United Community Bank has

-15-

priority over Prairie State Bank not because of what the title insurance policies say or do not say, but because to protect its own interest, United Community Bank paid off the construction mortgage with the loan proceeds or required McDonough to do so with the loan proceeds. See *Detroit Steel Products*, 17 Ill. App. 2d at 521; Restatement (Third) of Prop.: Mortgages § 7.6(a) (1997).

¶ 73                                 III. CONCLUSION

¶ 74        For the foregoing reasons, we affirm the trial court's judgment in part and reverse it in part and remand this case for further proceedings.

¶ 75        Affirmed in part and reversed in part; cause remanded.