2022 IL App (1st) 220485

FIFTH DIVISION
December 23, 2022

No. 1-22-0485

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| AS 1, LLC, an Illinois Limited Liability Company, | ) ) | On appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| CELTIC HOME SOLUTIONS, LLC, an Illinois Limited Liability Company; JENNIFER KELLY; ROBERT PAFFRATH; MICHAEL TRENCH; MICHELLE TRENCH; SKYLINE HOMES, INC., a Nevada Corporation; UNKNOWN OWNERS; UNKNOWN OCCUPANTS; UNKNOWN TENANTS; and NON-ECORD CLAIMANTS, | ) ) ) ) ) ) ) ) ) | No. 17 CH 5649 |
| Defendants | ) ) | |
| (Skyline Homes, Inc., Defendant-Appellant). | ) ) | The Honorable Lynn Weaver Boyle, Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Mitchell concurred in the judgment and opinion.

**OPINION**

¶ 1    In this appeal, two lienholders dispute which one has first priority to receive the proceeds of a foreclosure sale. The circuit court determined that the later-recorded lien had priority over the earlier-recorded lien under the doctrines of conventional and equitable subrogation. We affirm on the basis of conventional subrogation.

¶ 2                                I. BACKGROUND

¶ 3     The events relevant to this appeal began on November 25, 2015, when TruProperty Investments, LLC (TruProperty) and its owner Michael Albert and Celtic Homes Solutions, LLC (Celtic) and its owner Jennifer Kelly bought property on Whipple Avenue in Chicago (Whipple property) from Robert Paffrath. The two LLCs executed a mortgage against the property to secure a $304,500 loan given by Paffrath as mortgagee (original Paffrath loan/mortgage).

¶ 4     On October 18, 2016, the following events occurred at a refinancing closing. First, AS 1, LLC (AS 1), lent Celtic $375,000, secured by a construction mortgage on the property (AS 1 loan/mortgage). Celtic was the sole mortgagor, and Kelly was the guarantor of the underlying note. Second, TruProperty and Celtic executed a quit-claim deed, conveying the Whipple property solely to Celtic. Third, Celtic and Kelly, as mortgagors, also executed what is labeled as a "junior" construction mortgage on the Whipple property, to secure a new $205,000 loan given by Paffrath (second Paffrath loan/mortgage). The proceeds from the AS 1 loan were used, in part, to pay off the original Paffrath loan, and Paffrath released his original 2015 mortgage against the property. The documents generated at the October 18 closing were not recorded until about a month later— November 16, 2016, at 11:39 a.m.

¶ 5     The AS 1 mortgage is the focus of the litigation before us. Paragraph 12 of that mortgage, executed by Celtic as mortgagor, contains the following subrogation clause:

"Should any amount paid out or advanced by [AS 1], or pursuant to any agreement executed by [Celtic] in connection with the Loan, be used directly or indirectly to pay off, discharge or satisfy, in whole or in part, any lien or encumbrance upon the Premises or any part thereof, then [AS 1] shall be subrogated to any and all rights, equal or superior titles, liens and equities, owned or claimed by any owner or holder of said outstanding liens,

charges and indebtedness, regardless of whether said liens, charges and indebtedness are acquired by assignment or have been released of record by the holder thereof upon payment."

¶ 6 Paragraph 13(a) of the AS 1 mortgage states in part that Celtic agrees that the AS 1 mortgage "shall constitute a Security Agreement" against the property to secure the mortgage indebtedness and that Celtic "is and will be the lawful owner" of the property "subject to no liens, charges or encumbrances other than the lien of [the AS 1 mortgage], *other liens and encumbrances benefiting [AS 1] and no other party*, and liens and encumbrances, if any, expressly permitted by the other Loan Documents." (Emphasis added).

¶ 7 Around the time of the refinancing, apparently unbeknownst to Celtic and the parties then involved with the property, title to the property was encumbered by other liens stemming from the conduct of the prior co-owner, TruProperty Investments. When AS 1 filed this lawsuit, title to the Whipple property was encumbered not only by the AS 1 and the second Paffrath mortgages, but also by at least two recorded judgments. The first judgment was entered on August 15, 2016, by the circuit court of Cook County in case No. 16 M1 114732 in the amount of $17,909.00. In that case, Michael and Michelle Trench sued TruProperty for breach of contract concerning construction of the Trenches' home in Clarendon Hills. The circuit court entered a judgment in favor of the Trenches and against TruProperty. Because a search demonstrated that TruProperty owned the Whipple property, the Trenches recorded a memorandum of that judgment, encumbering the Whipple property, on October 19, 2016, at 1:27 p.m.—the day after the refinancing closing.

¶ 8 The second judgment was entered on October 12, 2016, by the circuit court for the Eighteenth Judicial Circuit (Du Page County), in case No. 16 CH 899 in the amount of

3

$117,601.50. In that case, Skyline Homes, Inc. (Skyline), also obtained a judgment against TruProperty. Skyline characterizes its underlying claim against TruProperty in the Du Page County case as one for "fraudulent misrepresentation in connection with rehabilitation" of certain property. Skyline recorded a memorandum of its Du Page County judgment in Cook County, also encumbering the Whipple property, at 3:10 p.m. on October 18, 2016—the same day as the refinancing closing. AS 1 asserts that this recording occurred mere "hours after the refinanc[ing] closing."

¶ 9     As noted above, there was about a month-long delay in recording the documents from the refinancing closing, which included the release of the first Paffrath mortgage. Accordingly, when both memoranda of judgments were recorded, the public records still showed that the property was partially owned by TruProperty and encumbered by the first Paffrath mortgage. Those records did not yet show that the first Paffrath mortgage had been released by virtue of the October 18, 2016, closing, or that TruProperty had deeded its interest away to Celtic.

¶ 10     Celtic did not pay the AS 1 mortgage in a timely manner. On April 19, 2017, AS 1 filed a two-count complaint relevant here. Count I was a standard claim for foreclosure of AS 1's mortgage. Count II was a claim for breach of contract, based on Celtic's failure to pay on the note.

¶ 11     Skyline filed an answer, affirmative defenses, and counterclaim, asserting that the Du Page County judgment lien in its favor had priority over the AS 1 mortgage. A month later, Paffrath filed an answer, affirmative defenses, and a counterclaim to foreclose on his second mortgage. The Trenches also filed a counterclaim to foreclose their own judgment lien.

¶ 12     AS 1 moved for summary judgment and a judgment of foreclosure and sale, arguing that its mortgage had priority over all other encumbrances, including Paffrath's second mortgage and the two judgment liens, under the doctrines of conventional and equitable subrogation.

¶ 13    In support of its motion, AS 1 offered the affidavit of its sole manager, Yan Pesotskiy, stating that AS 1 underwrote its loan to Celtic and Kelly specifically to refinance Paffrath's original loan. As "condition[s]" of his "agreeing to move forward with the requested refinancing," Pesotskiy asserted that (1) the proceeds from his new loan would have to be used to pay off the original Paffrath loan and (2) Paffrath would have to agree to subrogate his first loan to the AS 1 mortgage. Pesotskiy stated that Kelly and Paffrath agreed to "my request" and that he (Pesotskiy) agreed to proceed with the closing. Pesotskiy's affidavit does not explicitly state that Paffrath's first mortgage was paid off from the proceeds of his loan following the refinancing closing, but it does incorporate an allegation of the complaint stating that his funds were used to pay off Paffrath's original loan. Pesotskiy's affidavit also states that he only released his funds after he reviewed the executed release of Paffrath's original loan.

¶ 14    AS 1 argued that when the two judgment liens were recorded, the property was already encumbered by the first Paffrath loan, so the judgment creditors would have no expectation that their liens would have priority over the first Paffrath loan.

¶ 15    Skyline opposed AS 1's motion for summary judgment. It argued that when TruProperty quit-claimed its joint interest in the Whipple property to Celtic, it apparently failed to notify AS 1, Celtic, or Paffrath that Skyline had already obtained the Du Page County judgment against TruProperty. It argued that subrogation did not apply because AS 1 was not "stepping into the bargain" originally agreed by Paffrath. Specifically, it stated that the first Paffrath loan mortgagors (TruProperty, Albert, Celtic, and Kelly) were different from the mortgagors in the second Paffrath loan (only Celtic and Kelly). Therefore, two parties (TruProperty and Albert) had been released. Additionally, because Paffrath remained as a creditor under his second loan, AS 1 could not be asserting the same rights as the original creditor, Paffrath, as required to effectuate subrogation.

5

Finally, it argued that subrogation could not be applied to give priority to a lien in a greater amount than the principal amount of the original loan because such an application would harm an innocent lienholder such as Skyline. Here, the new loan was for a greater amount than the original loan, which it allegedly refinanced, thus harming Skyline's claim.

¶ 16    In their response to AS 1's motion for summary judgment, Kelly and Celtic argued that Skyline's Du Page judgment was void for lack of proper service and that there were efforts underway to vacate that judgment.[1] In an affidavit, Kelly stated that, at the time of the refinancing closing, she had no knowledge of the judgments entered against TruProperty, which eventually encumbered title to the Whipple property.

¶ 17    In its reply, AS 1 noted that Skyline had not presented any evidence to contradict AS 1's assertion that the funds from AS 1's loan were used to pay off Paffrath's original mortgage, a key predicate fact to the application of subrogation here.

¶ 18    On January 29, 2019, the circuit court granted AS 1's motion for summary judgment and entered an order of foreclosure and sale in favor of AS 1 and against Celtic, Kelly, Paffrath, the Trenches, and Skyline. The court determined priority of liens as follows: first, to costs of sale; second, to AS 1; and third, to Paffrath. Priority of all other claimants, except AS 1, was "deferred" until the hearing for confirmation of sale.

¶ 19    A first judicial sale was held, but it was vacated for reasons not relevant to this appeal. At the second judicial sale, a pair of outside third-party bidders purchased the property with a $323,000 bid, leaving a surplus of $30,941.69 to be distributed to junior lienholders, after deducting the sum of $292,058.31 due to AS 1.

---

[1]There were extensive efforts to vacate the Du Page County judgment, but the convoluted details of those proceedings are not relevant to this appeal. It will suffice to note that the appellate court for the Second District eventually upheld the judgment as valid. *Skyline Homes, Inc. v. TruProperty Investments, LLC*, No. 2-19-0396 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 20    On October 15, 2019, the circuit court entered what is captioned as an "agreed" order confirming the judicial sale of the property. The order is signed by counsel for all the parties as "APPROVED AND HEREBY AGREED TO," but counsel for Skyline noted under his signature that it was "approved as to form but not substance." In its order, the court found that only three entities were entitled to the limited proceeds of sale: AS 1, Skyline, and Paffrath. The court order acknowledges there was a dispute regarding priority of distribution of the proceeds. The court directed that $350 be first paid to the selling officer, then $197,650 be paid to AS 1 in partial satisfaction of its foreclosure judgment (leaving it with a balance owed of $94,058.31), and then the remaining $125,000 be placed in escrow to be held by Skyline's attorney, pending resolution of the Du Page County litigation.

¶ 21    The court ordered that when the Du Page County litigation was resolved, if the parties could not agree on the distribution of the escrowed funds, and if the Du Page County judgment was affirmed, Paffrath would receive $16,866.80 from the escrow plus interest, and AS 1 would receive the remainder. If, however, the Du Page County judgment was reversed, then the circuit court would adjudicate priorities among the claimants and direct distribution from the escrow accordingly.

¶ 22    Shortly after the appellate court for the Second District affirmed the Du Page County judgment, Skyline filed a motion for adjudication of its interest in the remaining sale proceeds. In response, AS 1 argued that it had priority over Skyline's Du Page County judgment lien under the principles of conventional and equitable subrogation because it had refinanced Paffrath's original mortgage.

¶ 23    It appears that on July 12, 2021, the circuit court orally resolved Skyline's motion in favor of AS 1. No transcript of that proceedings appears in the record. A draft order, resolving the

7

pending motion in favor of AS 1, was prepared but never entered. Believing that the circuit court had entered the draft order resolving its motion in favor of AS 1, Skyline filed a notice purporting to appeal that order (No. 1-21-0957). In reality, however, no such order had been entered, and this court eventually dismissed that appeal for want of prosecution.

¶ 24    Having discovered that the case was still pending, on February 3, 2022, AS 1 moved for entry of an order adjudicating lien priority. By this time, the case had been transferred to a new judge with no prior involvement. On March 8, 2022, that judge entered the draft order that had been prepared in accordance with the prior judge's oral ruling.

¶ 25    In that order, the circuit court denied Skyline's motion for turnover of escrow, found that the doctrines of equitable and conventional subrogation barred Skyline's claim to any of the $125,000 then held in escrow, and ordered that the escrowed funds be turned over to AS 1 within 30 days. That order resolved all issues remaining in the case, and this appeal followed.

¶ 26                                   II. ANALYSIS

¶ 27    In its brief, Skyline asserts that this court has jurisdiction over its appeal, pursuant to Illinois Supreme Court Rule 304(b)(3) (eff. Mar. 8, 2016). That rule governs appeals of orders granting or denying petitions for relief under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2020)), and it has no relevance to this case. Putting aside Skyline's puzzling reference to that rule, we find that we have jurisdiction over the final order of the circuit court pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017), which governs appeals from final orders. An order confirming the judicial sale of the subject property *and* approving distribution of sale proceeds normally terminates a foreclosure case and is appealable as a final order. *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 11 (citing cases). However, in this case, the "agreed" order of distribution and sale left the distribution of the sale proceeds open for further review and was not

8

final or appealable. The circuit court resolved that last open issue in its March 8, 2022, order, which directed distribution of the remaining proceeds to AS 1. At that point, the case was complete, and the order was appealable under Rule 303. *In re Marriage of Verdung*, 126 Ill. 2d 542, 555 (1989).

¶ 28 On appeal, Skyline argues that the circuit court erred in granting AS 1 priority over its judgment lien by applying the principles of conventional and equitable subrogation. In the court below, Pesotskiy's affidavit was unrefuted, and the briefing on this issue presented solely issues of law. Therefore, we will review the judgments below *de novo*. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002) (construction and determination of the legal effect of documents presents a question of law which is reviewed *de novo*).

¶ 29 We begin with a few familiar legal principles regarding priority of liens against real property. A lien is

> " 'a charge upon property, either real or personal, for the payment or discharge of a particular debt ***; an encumbrance upon property as security for the payment of a debt; or a hold or claim on another's property as security for the payment or performance of a debt, duty, or other obligation.' " *Eastman v. Messner*, 188 Ill. 2d 404, 407 (1999) (quoting *Gaskill v. Robert E. Sanders Disposal Hauling,* 249 Ill. App. 3d 673, 676 (1993)).

¶ 30 A mortgage is a type of consensual lien on real property. See 735 ILCS 5/15-1207 (West 2020). Specifically, it is an interest in land created by a written instrument that secures real estate to ensure the payment of a debt. *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703 (2000) (citing *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 111 (1993)). A mortgage lien is created upon recording of the mortgage with the county recorder of deeds. 735 ILCS 5/15-1301 (West 2020).

¶ 31     Quite often, the value of real property is insufficient to satisfy all the debts represented by the liens encumbering it. At common law, satisfaction of these liens and debts was governed by the "first-in-time, first-in-right" rule. *LaSalle Bank National Ass'n v. Cypress Creek 1, LP*, 242 Ill. 2d 231, 237 (2011) (citing 27A Ill. L. and Prac. *Mortgages* § 50 (2003)). Under that rule, a lien that is recorded first in time generally has priority and is entitled to prior satisfaction of the property it binds. *Cole Taylor Bank v. Cole Taylor Bank*, 224 Ill. App. 3d 696, 704 (1992).

¶ 32     The Conveyances Act (Act) (765 ILCS 5/1 *et seq.* (West 2020)) codifies the common law rule. Section 28 of the Act provides that deeds, mortgages, and other instruments relating to or affecting the title to real estate shall be recorded in the county in which such real estate is situated. *Id.* § 28. Section 30 of the Act, in turn, provides:

> "All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." *Id.* § 30.

¶ 33     The Act thus allows third parties to readily ascertain the status of title to real property. *Aames*, 315 Ill. App. 3d at 703-04 (citing *Lubershane v. Village of Glencoe*, 63 Ill. App. 3d 874, 879 (1978)). A purchaser of real estate may rely on the public record of conveyances and instruments affecting title, unless he has notice or is chargeable with notice of a claim or interest that is inconsistent with the record. *Wells Fargo Bank, N.A. v. Simpson*, 2015 IL App (1st) 142925, ¶¶ 56, 58 (citing *Reed v. Eastin*, 379 Ill. 586, 592 (1942)).

¶ 34    As the dispute before us illustrates, the doctrine of first in time, first in right is not without its exceptions. A separate body of law governs lien priority in cases involving renewal or refinancing notes and mortgages.

¶ 35    Subrogation is an equitable principle under which someone who involuntarily pays the debt of another succeeds to the rights of the original creditor with respect to the debt paid. *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992). In *Dix*, our supreme court has explained the principle of subrogation of liens as follows:

> "The right of subrogation is an equitable right and remedy which rests on the principle that substantial justice should be attained by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall. [Citation.] Subrogation is allowed to prevent injustice and unjust enrichment but will not be allowed where it would be inequitable to do so. [Citation.] There is no general rule which can be laid down to determine whether a right of subrogation exists since this right depends upon the equities of each particular case. [Citation.]
>
> One who asserts a right of subrogation must step into the shoes of, or be substituted for, the one whose claim or debt he has paid and can only enforce those rights which the latter could enforce." *Id.*

Accordingly, subrogation can give a later-recorded mortgage or lien priority over an earlier-recorded one.

¶ 36    Illinois law recognizes two types of subrogation: conventional and equitable. *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 99 (citing *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 17). Conventional subrogation can occur when the parties expressly agree that the party paying the debts on behalf of the third party can assert the rights of the original creditor.

11

*Id.* Conventional subrogation is commonly seen in modern refinancing transactions. See *Union Planters Bank, N.A. v. FT Mortgage Cos.*, 341 Ill. App. 3d 921, 926 (2003). A new lender seeking to be subrogated in lien priority when refinancing must demonstrate (1) there is an express agreement providing that the new lender will be able to assert the rights of the original creditor, (2) the previous debt was in fact paid off by the new lender, (3) no harm will come to an innocent party if priority is granted to the lender, and (4) there was no gross negligence. *Id.* at 925. Additionally, the lien priority is limited to the original amount perfected by the previous creditor. *Aames*, 315 Ill. App. 3d at 710.

¶ 37    Equitable subrogation has been described as an even more "elusive" doctrine than conventional subrogation. *Id.* at 706. It "prevents the unearned enrichment of one party at the expense of another and will be granted only where an equitable result will be reached." *Id.* at 707 (citing *Detroit Steel Products Co. v. Hudes*, 17 Ill. App. 2d 514, 520 (1958)). In its brief in this court, Skyline admits that the "[e]xact circumstances" of equitable subrogation "are not well defined in the caselaw."

¶ 38    The circuit court found that AS 1's mortgage lien had priority over Skyline's judgment lien under both conventional and equitable subrogation. The court's terse order provides absolutely no reasoning for this determination, and there is no transcript before us, but we can glean from the parties' arguments in the record that the court necessarily found that AS 1's refinancing of Paffrath's original loan was sufficient for AS 1 to "step in the shoes" of Paffrath and receive priority over Skyline's prior recorded lien.

¶ 39    The record readily supports the conclusion that AS 1 meets the basic requirements to be subrogated in lien priority over Skyline. See *Union Planters Bank, N.A.*, 341 Ill. App. 3d at 925 (stating elements of conventional subrogation). Pesotskiy's unrefuted affidavit establishes what

occurred at the refinancing closing, and it states that proceeds from AS 1's loan were used to pay off Paffrath's first loan. Together with that affidavit, the terms of the AS 1 mortgage establish that there was an agreement that AS 1 could assert the priority rights associated with Paffrath's first loan. Further, when Skyline recorded its lien, it was on fair notice that Paffrath's first loan would have priority over that lien. Finally, nothing in the record suggests that AS 1 acted negligently. Thus, all four elements of conventional subrogation were met.

¶ 40    Skyline nonetheless asserts several defenses to the application of conventional subrogation. We address each in turn.

¶ 41    Skyline contends that conventional subrogation cannot apply here because the debtors on the original Paffrath loan are different from the debtors on the AS 1 loan. AS 1 derides this argument as "not based on any actual law." As noted above, there were four debtors on the original loan (TruProperty, Albert, Celtic, and Kelly), but only two of that group remained obligated to pay AS 1's loan (Celtic and Kelly). Skyline correctly notes that, in many subrogation cases, the identity of the borrowers is the same, but the actual holdings of those cases do not rest on the fact that the borrowers are precisely the same or, on the other hand, are different. At the refinancing closing, TruProperty, which was owned by Albert, relinquished its interest in the property. Thus, there would have been no reason to keep them obligated on the loan. AS 1 aptly notes that parties are free to negotiate among themselves to resolve debt disputes. Parties may die, discharge their debts in bankruptcy, or otherwise depart from the scene. We cannot find, based on the facts presented here, that the release of two of the four original debtors would itself prevent the application of conventional subrogation.

¶ 42    We also agree with AS 1 that application of conventional subrogation would not cause harm to Skyline as an "innocent party" because Skyline recorded its lien with constructive

knowledge that there was a large mortgage already encumbering title to the property. Our supreme court has explained:

>"A purchaser of land is charged with constructive notice not only of whatever is shown in the records of the office of the recorder of deeds \*\*\*. It is the duty of a purchaser of land to examine the record and he is chargeable with notice of whatever is shown by the record." *Eckland v. Jankowski*, 407 Ill. 263, 267 (1950); see also *La Salle Bank, N.I. v. First American Bank*, 316 Ill. App. 3d 515, 523 (2000) (court rejected similar argument by applying subrogation to give a mortgagee a priority position because doing so left the other mortgagee "in the same position" as when he first contracted to buy the property).

¶ 43　Skyline next argues that AS 1 is only entitled to subrogation up to the $304,500 amount of the principal of its original loan, omitting any accumulated interest or costs. Skyline apparently relies on the following language in *Aames* to support this contention: "[A] refinancing mortgagee that records its mortgage lien is entitled to be subrogated to the original lien, and its corresponding priority position, established by the original mortgagee \*\*\* *up to the amount that the original mortgage secured at the time of its perfection*." (Emphasis added.) *Aames*, 315 Ill. App. 3d at 710. The *Aames* holding is arguably ambiguous with respect to what is meant by the clause "up to the amount the original mortgage secured." This clause can be read in two ways. Skyline suggests that the italicized clause limits AS 1's subrogation right to the *principal* amount of the original mortgage. AS 1 counters that "the time of its perfection" refers to the amount due and owing on the first mortgage, including accumulated interest, when the *second* mortgage was perfected, not when the first mortgage was perfected. Neither the parties nor our own research has revealed any other Illinois case specifically addressing this question.

¶ 44    *Aames* addresses the issue tangentially. Before announcing its ultimate holding, the *Aames* court explained:

> "Conventional subrogation is a right springing from an agreement with the debtor where the subrogee advances money to pay a claim that carries a lien and where the subrogee and the debtor agree that the subrogee *is to have an equal lien to the one paid off*. *** In this case, Aames, as the assignee of the subrogee, is entitled to the benefit of the security *attaching to the debt that it satisfied with the expectation of receiving an equal lien*." (Emphases added.) *Id.* at 709.

¶ 45    The principal amount of a mortgage fixes its value as a lien for only the fleeting moment when it is executed. Even a day later, some interest has accrued, thus increasing the amount of that lien. Over time, payments may reduce the principal balance. To give the second lender the benefit of its bargain, it must be subrogated up to the amount due on the first loan at the time of the refinancing. Here, the value of the lien of Paffrath's first mortgage at the time of the refinancing was not merely the principal balance or the remaining principal balance; it was some other, presumably higher amount. By focusing on the *Aames* court's full analysis, rather than by taking a few words out of context, we are led to agree with AS 1 that it is entitled to subrogate up to the amount owed on Paffrath's original loan. To hold otherwise would inequitably deprive AS 1 of the benefit of its bargain.

¶ 46    We find additional support for this conclusion in cases from other jurisdictions. The Restatement (Third) of Property states that "Ordinarily lenders who provide refinancing desire and expect [to get security with a priority equal to the mortgage being paid], even if they are aware of an intervening lien." Restatement (Third) of Property: Mortgages § 7.6 cmt. e (Oct. 2022 Update).

¶ 47    In *Bank of America, N.A. v. Prestance Corp.*, 160 P.3d 17, 19, 29 (Wash. 2007) (*en banc*), the Washington Supreme Court adopted that section of the Restatement and held that a lender was equitably subrogated to the first-priority lien position of another lender in the $499,477 "*payoff amount*" at the time of the second lender's perfection of its lien. (Emphasis added).

¶ 48    A Nevada court applied the same Restatement section in a case where the second mortgage was for a larger amount than that due under the first. The court explained:

"Section 7.6, comment e requires that '[t]he payor is subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien. There is no right of subrogation with respect to any excess funds.' [Citation.] It also recognizes that when a new lender *** demands a higher interest rate, an intervening lienholder is not prejudiced because subrogation is 'granted only to the extent of the debt balance that would have existed if the interest rate had been unchanged.' " *American Sterling Bank v. Johnny Management LV, Inc.*, 245 P.3d 535, 540 (Nev. 2010).

The court continued: "Because there is no subrogation for amounts in excess of *the amount paid to discharge the prior lien* [citation], it would appear equitable that the lien securing these excess amounts necessarily becomes a junior lien behind all other previously recorded liens." (Emphasis added.) *Id.* at 540 n.2. The Nevada court's holding presumes the principle we adopt here—that the second lender is subrogated up to the amount due and owing to the first lender, not merely up to the original principal amount borrowed.

¶ 49    Likewise, a New Jersey reviewing court allowed subrogation up to the amount actually due on the first loan, rather than only the original principal amount, explaining:

"Moreover, by limiting the first lien priority of plaintiff's mortgage to the balance due on the FIFC mortgage at closing, the superior lien balance owed by the Deelys was not

increased. In addition, as part of the transaction, the HECLA balance was satisfied. Under these circumstances, defendant is not materially prejudiced by subrogating plaintiff's mortgage." *New York Mortgage Trust 2005-3 Mortgage-Backed Notes, U.S. Bank National Ass'n as Trustee v. Deely*, 246 A.3d 838, 847 (N.J. Super. Ct. App. Div. 2021).

¶ 50    In sum, we find that the circuit court did not err in holding that not only was AS 1's mortgage lien conventionally subrogated to Paffrath's original mortgage lien, and thus had priority over Skyline's lien, but that it was subrogated up to the amount owed on the Paffrath loan at the time AS 1 refinanced it. This holding renders it unnecessary for us to determine whether equitable subrogation applies under the facts presented.

¶ 51                                  III. CONCLUSION

¶ 52    We affirm the circuit court's order finding that AS 1's mortgage lien had priority over Skyline's judgment lien up to the amount owned to Paffrath at the time AS 1 paid off the Paffrath loan.

¶ 53    Affirmed.

*AS 1, LLC v. Celtic Home Solutions, LLC*, **2022 IL App (1st) 220485**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-5649; the Hon. Lynn Weaver Boyle, Judge, presiding. |
| **Attorneys for Appellant:** | Joseph Whang and Robert K. Naumann, of Naumann, Agnello & Associates, LLC, of Elk Grove Village, for appellant. |
| **Attorneys for Appellee:** | Saskia Nora Bryan and Sheryl A. Fyock, of Latimer LeVay Fyock LLC, of Chicago, for appellee. |